# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| Midwest Engineering Services, Inc., | ) | |
| Professional Service Industries, Inc., | ) | |
| GME Consultants, Inc., and | ) | |
| GME Consultants of Illinois, Inc., | ) | |
| | ) | Case No. 05 C 50023 |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL REQUESTED |
| v. | ) | |
| | ) | |
| International Union of Operating Engineers, | ) | |
| Local 150, AFL-CIO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## LOCAL 150's MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dale D. Pierson
Robert E. Entin
Bryan P. Diemer
Charles R. Kiser
IUOE LOCAL 150
LEGAL DEPARTMENT
6140 Joliet Road
Countryside, IL 60525
Ph. 708/579-6663
Fx. 708/588-1647

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT OF FACTS ..................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

    I.    Local 150 Did Not Enter into Any Unlawful Section 8(e) Agreements, Administer Any Job-Targeting Programs or Engage in Stripping................................................. 2

        A.    There were no unlawful 8(e) agreements.................................................... 3

        B.    There were no job-targeting programs........................................................ 5

        C.    Local 150 did not "strip" employees. ......................................................... 5

    II.    Plaintiffs Are Not Entitled to Relief Under the Sherman Act. ................................. 6

        A.    Local 150 is exempt from antitrust liability................................................ 6

            1.    The statutory exemption applies. .................................................... 6

            2.    The non-statutory (or implicit) exemption applies. ........................ 7

        B.    Plaintiffs do not have antitrust standing...................................................... 9

        C.    Plaintiffs are not entitled to relief under Section 1 of the Sherman Act......... 11

            1.    Plaintiffs failed to establish a conspiracy..................................... 11

            2.    Plaintiffs failed to establish an unreasonable restraint...................... 13

                 a.    The *per se* rule is inapplicable. .................................... 13

                 b.    Plaintiffs' claim fails under the Rule of Reason. .................... 14

                     i.    Plaintiffs failed to identify the relevant market and offered no economic market analysis. ....................... 14

                    ii.    Local 150's conduct had no unlawful effect on competition. .............................................................. 15

        D.    Plaintiffs are not entitled to relief under Section 2 of the Sherman Act......... 16

            1.    Local 150 does not have monopoly power in any product market..... 16

            2.    Local 150 did not attempt to acquire any power in any product market. ..................................................................................... 17

    III.    Plaintiffs Are Not Entitled to Relief Under Section 303 of the LMRA..................... 18

        A.    Local 150 Did Not Violate Section 8(b)(4). ................................................. 18

            1.    There is no evidence of unlawful conduct. ....................................... 18

            2.    There is no evidence of unlawful motive............................................ 20

        B.    Any alleged damages were not caused by violations of Section 8(b)(4)........ 21

    IV.    Plaintiffs Are Not Entitled to Relief Under Their Tortious Interference with Contract Claim and Tortious Interference with Business Relationships Claim. ........ 22

CONCLUSION....................................................................................................................... 24

## TABLE OF AUTHORITIES

### Cases

Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797 (1945) ...................................................... 6, 7

American Steel Erectors, Inc. v. Local Union 7, 2006 U.S. Dist. LEXIS 4348 (D. Mass
    Feb. 6, 2006) .................................................................................................................. 23

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)......................................................... 2

Apex Hosiery Co. v. Leader, 310 U.S. 469 (1940)............................................................ 7, 16

Associated Builders and Contractors, Inc., 331 NLRB 132 (2000)................................... 5

Boxhorn's Big Muskego Gun Club v. Electrical Workers Local 494, 798 F.2d 1016 (7th
    Cir. 1986) ..................................................................................................................... 22

Boyd Asphalt, Inc. v. International Union of Operating Engineers, Local 150, AFL-CIO,
    Case No. 2:00-CV-262 (N.D. Ind. January 4, 2002) .............................................. 19

Brown v. Pro Football, Inc., 518 U.S. 231 (1996)............................................... 6, 8, 14

Building and Construction Trades Council of the Metropolitan District v. Builders and
    Contractors, 517 U.S. 218 (1993) .............................................................................. 4

C&K Coal Co. v. United Mine Workers of America, 704 F.2d 690 (3d Cir. 1983) .................... 7

Can-Am Plumbing, Inc. v. NLRB, 321 F.3d 145 (D.C. Cir. 2003)................................... 5

Comtel Technologies, Inc. v. Solai, Case No. 04 C 3879, 2005 U.S. Dist. LEXIS 8370
    (N.D. Ill. Feb. 22, 2005)............................................................................................. 23

Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S.
    616 (1975) ............................................................................................................ 6, 8, 9

Consolidated Express, Inc. v. New York Shipping Assoc., 602 F.2d 494 (3d Cir. 1979).............. 8

DeAnza Delivery System, Inc., 224 NLRB 1116 (1976) ..................................................... 4

DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades, 485 U.S. 568 (1988)................ 19

Denny's Marina, Inc. v. Renfro Prod., 8 F.3d 1217 (7th Cir. 1993).............................. 11

DSC Logistics, Inc. v. Innovative Movements, Inc., Case No. 03 C 4050, 2004 U.S. Dist.
    LEXIS 1412 (N.D. Ill. Feb. 4, 2004) ......................................................................... 23

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992) ............................ 16

Ehredt Underground, Inc. v. ComEd Co., 90 F.3d 238 (7th Cir. 1996) ................................ passim

Endsley v. City of Chicago, 230 F.3d 276 (7th Cir. 2000)............................................... 17

Feather v. United Mine Workers of America, 711 F.2d 530 (3d Cir. 1983) ................................ 21

Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203 (1964) ..................................... 10

Flynn v. Phillip Morris USA, Inc., Case No. 05 C 318, 2006 U.S. Dist. LEXIS 2438
    (N.D. Ill. Jan. 19, 2006) ............................................................................................. 14

Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters, 623 F.2d 1354 (9th Cir.
    1980) ............................................................................................................................ 21

General Contractors Assoc. of New York, 262 NLRB 528 (1982)................................... 4

Genser v. IBEW, Local 134, 522 F. Supp. 1153 (N.D. Ill. 1981) ............................... 16

Goldwasser v. Ameritech Corp., 222 F.3d 390 (7th Cir. 2000)....................................... 10

J. Pease Constr. Co, Inc. v. Local 150, International Union of Operating Engineers, AFL-
    CIO, Case No. 87 C 10515, 1992 U.S. Dist. LEXIS 5659 (N.D. Ill. April 7, 1992)............... 20

J.A. Croson Co. v. J.A. Guy, Inc., 691 N.E.2d 655 (Ohio S.Ct. 1998) ................................ 5

JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 179 F.3d 1073 (7th Cir. 1999) .......................... 12

Landgrebe Motor Transport Inc. v. District 72, Int'l Assoc. of Machinists & Aerospace
    Workers, 763 F.2d 241 (7th Cir. 1985)...................................................... 19, 20, 21

iii

Local 20, Teamsters v. Morton, 377 U.S. 252 (1964) ................................................. 22

Local 761, International Union of Electrical, Radio and Machine Workers v. NLRB, 366
U.S. 667 (1961) ................................................................................. 18, 20, 21

Manno Electric, 321 NLRB 278 (1996) ...................................................................... 5

Market Force Inc. v. Wauwatosa Realty Co., 906 F.2d 1167 (7th Cir. 1990) ............................ 11

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ............................ 11, 12

Mautz & Oren, Inc. v. Teamsters Local 279, 882 F.2d 1117 (7th Cir. 1989) ....................... 18, 21

Mead v. Retail Clerks Int'l Assoc., 523 F.2d 1371 (9th Cir. 1975) ................................... 22

Meat Cutters v. Jewel Tea Co., 381 U.S. 676 (1965) .................................................... 8

Menasha Corp. v. News America Marketing In-Store, Inc., 354 F.3d 661 (7th Cir. 2004) ... 14, 15

Mid-America Regional Bargaining Association ("MARBA") v. Will County Carpenters
Dist. Council, 675 F.2d 881 (7th Cir. 1982) ................................................. 6, 8, 9, 16

Midwest Gas Servs., Inc. v. Ind. Gas Co., 317 F.3d 703 (7th Cir. 2003) ................................. 9, 10

Milwaukee and Southeast Wisc. Dist. Council of Carpenters v. Rowley-Schlimgen, Inc.,
2 F.3d 765 (7th Cir. 1993) ........................................................................... 3

Minnesota Mining & Manufacturing Co. v. Pribyl, 259 F.3d 587 (7th Cir. 2001) ..................... 14

Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984) .................................... 11

NLRB v. Denver Building & Constr. Trades Council, 341 U.S. 675 (1951) .............................. 19

NLRB v. Ironworkers Local 433, 850 F.2d 551 (9th Cir. 1988) ....................................... 20

NLRB v. Servette, 377 U.S. 46 (1964) ..................................................................... 19

NYNEX Corp. v. Discon, Inc., 525 U.S. 128 (1998) ...................................................... 13

Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150, 529 F.2d
1284 (9th Cir. 1976) ................................................................................... 18

Payne Electric Company, Inc., 1998 NLRB LEXIS 863 (1998) ......................................... 5

Phil Tolkan Datsun, Inc. v. The Greater Milwaukee Datsun Dealers' Advertising Assoc.,
Inc., 672 F.2d 1280 (7th Cir. 1982) ............................................................... 13

Pickens-Bond Constr. Co. v. United Bhd. of Carpenters, Local 690, 586 F.2d 1234 (8th
Cir. 1978) ................................................................................................ 18

R.J. Corman R.R. Co. v. Local 150, Case No. 00 C 4119, 2000 U.S. Dist. LEXIS 16792
(N.D. Ill. Nov. 15, 2000) ............................................................................ 16

Republic Tobacco Co. v. North Atlantic Trading Co., Inc., 381 F.3d 717 (7th Cir. 2004) ......... 14

Richards v. Neilson Freight Lines, 810 F.2d 898 (9th Cir. 1987) ..................................... 8

Sailor's Union of the Pacific (Moore Dry Dock), 92 NLRB 547 (1950) ............................... 21

San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959) ............................ 22, 23

Stamatakis Indus., Inc. v. King, 965 F.2d 469 (7th Cir. 1992) ........................................ 9

Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263 (1965) ................................... 10

The Careau Group, 295 NLRB 704 (1989) ................................................................ 4

The Great Escape, Inc. v. Union City Body Co., Inc., 791 F.2d 532 (7th Cir. 1986) .................. 15

Tresca Brothers Sand & Gravel v. Truckdrivers Local 170, 19 F.3d 63 (1st Cir. 1994) ............. 21

Tri-Gen, Inc. v. IUOE, Local 150, et al., Cause No. 4:03CV0009 (N.D.Ind. January 14,
2005) .............................................................................................. 7, 10

UFCW, Local 1036 v. NLRB, 307 F.3d 760 (9th Cir. 2002) ....................................... 7

UFCW, Local 1776, 334 NLRB No. 73 (2001) .......................................................... 18

United Mine Workers of America v. Pennington, 381 U.S. 657 (1965) ...................... 6, 7, 8, 15

United Mine Workers v. Gibbs, 383 U.S. 715; 86 S.Ct. 1130 (1966) .............................. 22

iv

United Rentals Highway Tech., Inc. v. Indiana Constructors, Inc., 518 F.3d 526 (7th Cir. 2008) ................................................................................................................................ 3
United States v. Hutcheson, 312 U.S. 219 (1941) .................................................................. 6
USS-Posco Indust. v. Contra Costa County Building and Constr. Trades Council, 31 F.3d 800 (9th Cir. 1994) ............................................................................................................ 6, 7
Verizon Communications Inc., 540 U.S. 398 (2004) ........................................................ 16, 17
Wisconsin Department of Industry v. Gould, 475 U.S. 282 (1986) ...................................... 22
Woelke & Romero Framing, Inc., 456 U.S. at 666 .............................................................. 3
Woolcast Corp., 334 NLRB 203 (2001) .............................................................................. 5

### Statutes

29 U.S.C. § 158(b)(4)(i) ..................................................................................................... 18
29 U.S.C. § 159 ................................................................................................................... 2
29 U.S.C. § 187 ................................................................................................................. 18
Clayton Act, 15 U.S.C. § 17, and 29 U.S.C. § 52 .............................................................. 6
Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113 ..................................................... 6

### Other Authorities

R. Posner & F. Easterbrook, ANTITRUST (2d. Ed. 1981) ...................................................... 8

### Rules

Fed. R. Civ. P. 56(c) .......................................................................................................... 2

## STATEMENT OF FACTS

Local 150 is a labor organization representing heavy equipment operators including drill rig operators and helpers, construction materials testing technicians, and other employees in the construction and other related industries (Facts ¶ 1).

Construction materials testing is an essential part of the construction process. Geotechnical drilling sets the stage for any construction project by determining the nature of soil and forecasting any problems with subsurface and/or underground work.  If construction materials such as concrete, asphalt, steel welds, and other components were not tested, owners and contractors would not know if projects met engineering specifications.  Non-conforming structures mean owners and taxpayers are not getting what they pay for as roads deteriorate early and, in a worst-case scenario, bridges and buildings collapse.

The state of Illinois considers materials testing and drilling to be construction work for prevailing wage and mechanics' liens purposes (Facts ¶ 7, 10).  So does the U.S. Department of Labor which approved an apprenticeship program for Local 150-represented materials testers in 2005[?] (Facts ¶ 12).  Testing technicians consider themselves construction workers, subject to the same working conditions as any other craft workers on any given construction site (Facts ¶ 9).

Beginning in 2001, Local 150 began a concerted effort to organize employees working in the construction materials testing and drilling industry (Facts ¶ 14).[1]  Between that time and 2005, Local 150 organized over 600 employees, working for approximately 30 employers (Facts ¶ 14).  Local 150 secured the right to represent employees in collective bargaining either

---

[1] Local 150 has always represented drill rig operators and helpers as part of its core craft jurisdiction (Facts ¶ 11); and since 1994, has represented materials testing technicians when it organized the employees of K & S Testing and obtained certification as the exclusive collective bargaining representative in an NLRB-conducted election (Facts ¶ 13).

as a result of NLRB-conducted elections (Facts ¶¶ 13, 21), or voluntary recognition by the employer (Facts ¶¶ 20, 22), or NLRB bargaining order (Facts ¶ 26).[2]

At the outset of this campaign, employees in the testing industry routinely earned between $8.00 and $14.00 per hour, co-paid for their health insurance, and contributed to 401(k) profit-sharing plans if they had any retirement benefits at all (Facts ¶ 172). Under Local 150 collective bargaining agreements at the time this lawsuit was filed, testing technicians customarily started at wages of $21.00 per hour and earned as much as $32.00 per hour depending on their classification (Facts ¶ 173), receive 100-percent employer-funded healthcare coverage, and earn credit towards a defined-contribution pension plan (Facts ¶ 173).

## ARGUMENT

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). This Court should enter summary judgment in favor of Local 150 for the following reasons.

**I.      Local 150 Did Not Enter into Any Unlawful Section 8(e) Agreements, Administer Any Job-Targeting Programs or Engage in Stripping.**

Plaintiffs buttress their antitrust claims on specific allegations of various unlawful Section 8(e) agreements, an alleged job targeting program and an alleged union practice of "stripping." The record remains devoid of any evidence to support these allegations.

---

[2] Congress endorsed either elections or voluntary recognition as acceptable ways for unions to prove their majority support under Section 9 of the NLRA. 29 U.S.C. § 159. Section 9(c)(1) states in pertinent part that "Whenever a petition shall have been filed, in accordance with such regulations as may be proscribed by the Board—(A) by an employee or group of employees or any individual or labor organization acting on their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize the representative as their representative defined in [Section 9(a)]…The Board shall investigate such petition, and if it has reasonable cause to believe that a question of representation affecting commerce exists…[conduct a hearing if appropriate and]…If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof." 29 U.S.C. § 159(c)(1)(A).

### A.     There were no unlawful 8(e) agreements.

Plaintiffs have alleged that Local 150 entered into a host of agreements proscribed by Section 8(e) of the NLRA.[3]  In the main, Section 8(e) of the NLRA bans so-called "hot-cargo agreements"; that is, agreements that prohibit a signatory employer from transacting business with employers that employ non-union labor.  <u>Milwaukee and Southeast Wisc. Dist. Council of Carpenters v. Rowley-Schlimgen, Inc.</u>, 2 F.3d 765, 766 (7th Cir. 1993).  Section 8(e) contains, however, the "'construction industry proviso,' which places such agreements between unions and employers 'in the construction industry' beyond the reach of the statute."  <u>Id.</u> at 766.  Therefore, construction industry unions and employers may lawfully enter into agreements that prohibit the signatory employer from subcontracting work to non-union companies, even though such agreements may yield anti-competitive effects.  <u>Woelke & Romero Framing, Inc.</u>, 456 U.S. at 666; <u>see also</u> <u>Ehredt Underground, Inc. v. ComEd Co.</u>, 90 F.3d 238, 240 (7th Cir. 1996).

The State of Illinois, materials testing employers, and their employees consider materials testing to be work within the construction industry (Facts ¶ 5-10).[4]  The construction industry proviso to Section 8(e) therefore applies here.  In <u>United Rentals Highway Tech., Inc. v. Indiana Constructors, Inc.</u>, 518 F.3d 526, 527 (7th Cir. 2008), plaintiff's employees performed "traffic control" on highway projects and including tasks such as placing "cones, barrels, concrete blocks, or other barricades in position to block or alter traffic lanes," and other activities designed to protect highway construction workers from traffic.  <u>Id.</u> at 527-28.  The plaintiff in <u>United Rentals</u> argued its employees were not engaged in construction for purposes of Section 8(e).  The Seventh Circuit rejected the argument, explaining that "the statutory exception is not for construction workers as such; it is for workers at a construction site; and traffic control workers work at highway construction sites."  <u>Id.</u> at 530.  The construction testing employees at

---

[3] <u>See</u> Complaint ¶¶ 9; 12; 12(c), (i), (j), (bb), (gg), (rr), (tt); 16; 18; 24; 25; 26; 30; 33; 34; 34(b), (c), (d), (e), (f); 35; 41; 54; 57; 58; 58(c), (d), (e), (f), (g), (h), (i), (j); 59; 63 (b), (c), (d); 64; 64(b)(iii), (iv); 67; 68; 69(b)(iii), (iv), and 72.

[4] Plaintiffs themselves allege they work in the construction industry (<u>see</u> Complaint ¶¶ 13, 17, 20).

issue in this case perform their work at construction sites. Under United Rentals, the construction testing employees are engaged in "construction" for purposes of Section 8(e).

Section 8(e) requires an actual "contract or agreement" entered into voluntarily between a union and an employer. The Careau Group, 295 NLRB 704, 713 (1989). Other than lawful construction industry subcontracting clauses found in collective bargaining agreements, or lawful project labor agreements (see, Building and Construction Trades Council of the Metropolitan District v. Builders and Contractors, 517 U.S. 218 (1993)), there are no other actual "contracts or agreements" in this record. Plaintiffs argue, nevertheless, that there was a "contract or agreement" for purposes of Section 8(e) each time a third party ceased doing business with Plaintiffs as a result of Local 150's picketing or handbilling. Plaintiffs' argument has been repeatedly rejected by the NLRB. For example, in DeAnza Delivery System, Inc., 224 NLRB 1116, 1123 (1976), the neutral employer ceased doing business with the primary employer because of the union's unlawful secondary picket. The NLRB held that the neutral's role "was that of acquiescence and not of agreement" and that there was no 8(e) agreement because the neutral's acquiescence to the union's demand did not constitute a "contract or agreement." Id. at 1124.

Similarly, in General Contractors Assoc. of New York, 262 NLRB 528, 547-548 (1982), the NLRB adopted the portion of the Trial Examiner's opinion that held, "[m]oreover, it seem[s] unlikely that Section 8(e), in utilizing the words 'contract or agreement' was intended to encompass those situations where an employer, in the absence of a prior agreement, acquiesces in union pressure to cease doing business with a person with whom the union has a dispute." Section 8(e) requires an actual contract or agreement; there are none in this record (Facts ¶ 90, 91, 95, 97, 104, 111, 116, 129, 135, 140, 144), a fact further confirmed by Plaintiffs' own expert, Dr. Glenn Meyers. Meyers stated in his deposition that there were no such written agreements in this case (Facts ¶ 76). The NLRB agreed, and dismissed Plaintiffs' charges against Local 150 alleging 8(e) agreements (Facts ¶ 146).

4

**B.      There were no job-targeting programs.**

Plaintiffs also point to an alleged job-targeting program[5] as an example of anticompetitive conduct.  Some unions use job-targeting programs to supplement the wages of union workers so that union contractors facing higher labor costs may bid on a parity with non-union contractors that have lower labor costs.  <u>Manno Electric</u>, 321 NLRB 278, 298 (1996), <u>enf'd</u> 127 F.3d 34 (5th Cir. 1997).  Notably, job-targeting programs are lawful and expressly protected by Section 7 of the Act.  <u>Id.</u>; <u>Associated Builders and Contractors, Inc.</u>, 331 NLRB 132, 132 (2000); <u>Can-Am Plumbing, Inc. v. NLRB</u>, 321 F.3d 145 (D.C. Cir. 2003); <u>J.A. Croson Co. v. J.A. Guy, Inc.</u>, 691 N.E.2d 655, 663 (Ohio S.Ct. 1998).  Regardless, there is no evidence in this record that any signatory contractors or member employees ever received target monies or that there was ever a job-targeting program in existence (Facts ¶ 62-64, 174).

**C.      Local 150 did not "strip" employees.**

Plaintiffs allege that Local 150 unlawfully caused Plaintiffs' employees to quit their jobs and move to one of the union testing firms; Plaintiffs refer to this as "stripping."[6]  There are several defects in this allegation.  First, because of its successful organizing campaign, Local 150 allegedly was able to organize 70 percent of the construction testing industry and raise wages and benefits throughout the industry.[7]  Against this backdrop, it should come as no surprise that some of Plaintiffs' employees may have decided to work for a union contractor and receive Union wages and benefits.  Second, there is no evidence in this record that Local 150 actively "stripped" employees.  Finally, even if Local 150 engaged in the practice, Congress and the NLRB consider "stripping" lawful activity protected by § 7 of the NLRA.  <u>Woolcast Corp.</u>, 334 NLRB 203, 212 (2001); <u>Payne Electric Company, Inc.</u>, 1998 NLRB LEXIS 863 (1998); <u>see also</u> Norris-LaGuardia Act, § 4, 29 U.S.C. § 104 (prohibiting federal courts from entering injunctions

---

[5] <u>See</u> Complaint ¶¶ 7; 8; 12(a), (g), (h), (s), (dd), (qq), (ss); 25; 48; 62, 63(c); 64(b)(iv); and 72.
[6] <u>See</u> Complaint ¶ 12(nn), (oo); 49; 68; 72.
[7] <u>See</u> Complaint ¶ 12(y); 15.

against any persons from "ceasing or refusing…to remain in any relation of employment."). There is simply no evidence to support Plaintiffs' specific allegation of unlawful conduct.

## II.     Plaintiffs Are Not Entitled to Relief Under the Sherman Act.

### A.     Local 150 is exempt from antitrust liability.

Federal law provides a "comprehensive exemption from antitrust liability for union activity." Mid-America Regional Bargaining Association ("MARBA") v. Will County Carpenters Dist. Council, 675 F.2d 881, 884 (7th Cir. 1982). This is because Congress "hoped to prevent judicial use of antitrust law to resolve labor disputes." Brown v. Pro Football, Inc., 518 U.S. 231, 236 (1996). Labor unions enjoy two types of exemptions from federal antitrust laws: statutory and non-statutory (or implicit). MARBA, 675 F.2d at 884. Each applies in this case.[8]

#### 1.     The statutory exemption applies.

The statutory labor exemption flows from the Clayton Act, 15 U.S.C. § 17, and 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113. MARBA, 675 F.2d at 884. Those statutes "exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws." Connell Const. Co., Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 622 (1975) (emphasis supplied), citing, United States v. Hutcheson, 312 U.S. 219 (1941). The statutory labor exemption is not an affirmative defense; it is an element of any claim brought against a union for an antitrust violation. USS-Posco Indust. v. Contra Costa County Building and Constr. Trades Council, 31 F.3d 800, 805 fn. 3 (9th Cir. 1994), citing, United Mine Workers of America v. Pennington, 381 U.S. 657, 669 (1965). Therefore, to bring an antitrust claim against a union, a plaintiff must prove: (1) that the union did not act in its own self-interest, and (2) that a union combined with a non-labor group. MARBA, 675 F.2d at 885, citing, Hutcheson, 312 U.S. 219, and Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797 (1945). Plaintiffs must prove both elements to get past the statutory

---

[8] Although Plaintiffs style this case as an antitrust action, Plaintiff MES in a June 21, 2006 letter to its employees stated it had filed this lawsuit because it believes "it is unethical and creates a conflict of interest for technician employees…to be considered in the construction industry and therefore being capable of being organized" (Facts ¶ ___).

exemption. MARBA, 675 F.2d at 887, ("[t]he mere combination by a union with 'non-labor groups' does not violate the Sherman Act. To hold otherwise would invalidate collective bargaining"); see also Tri-Gen, Inc. v. IUOE, Local 150, et al., Cause No. 4:03CV0009 at 3 (N.D.Ind. January 14, 2005), aff'd 433 F.3d 1024 (7th Cir. 2006) ("It must be mentioned that the two aforesaid tests found in [MARBA] are in the conjunctive and not the disjunctive") (case attached hereto as Exhibit A).

Plaintiffs have failed to establish either element. Organizing workers, standardizing wages and working conditions, opposing unfair labor practices, and encouraging the use of unionized labor are all objectives well within the legitimate interests of a labor union. Apex Hosiery Co. v. Leader, 310 U.S. 469, 503 (1940), Pennington, 381 U.S. 657, 666 (1965); UFCW, Local 1036 v. NLRB, 307 F.3d 760 (9th Cir. 2002); USS-Posco Indust., 31 F.3d at 809. Moreover, absent an agreement, there can be no concert of action with a non-labor party, and thus no possibility of antitrust liability. C&K Coal Co. v. United Mine Workers of America, 704 F.2d 690, 699 (3d Cir. 1983). A labor union only loses its immunity when it combines with non-labor groups to create business monopolies and to control the marketing of goods and services. Allen Bradley Co., 325 U.S. 797. In this case, the evidence overwhelmingly establishes that Local 150 was organizing workers, negotiating collective bargaining agreements, protesting failure to pay area standard wages and benefits, and promoting the use of union labor (Facts ¶ 10, 12-15, 17, 19-30, 40-46, 48-55). The evidence also overwhelmingly demonstrates that Local 150 was actively organizing Plaintiffs' field technician employees (Facts ¶ 27-34, 40-46, 48-55, 173). Moreover, as previously stated, Plaintiffs have failed to present any evidence to even suggest that Local 150 entered into any agreements with any non-labor groups to create business monopolies. The statutory labor exemption shields Local 150 from any liability under the Sherman Act.

### 2. The non-statutory (or implicit) exemption applies.

The non-statutory exemption represents an accommodation between the congressional policy favoring collective bargaining and the congressional policy favoring free competition in

business markets, Connell, 421 U.S. at 623, citing, Meat Cutters v. Jewel Tea Co., 381 U.S. 676 (1965), and therefore "shields from antitrust sanctions" "some restraints on competition imposed through the bargaining process." Brown, 518 U.S. at 236-237. In Connell, 421 U.S. at 622, the Supreme Court observed, "[u]nion success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws." Similarly, in Richards v. Neilson Freight Lines, 810 F.2d 898, 905 (9th Cir. 1987), then-Circuit Judge Anthony Kennedy observed, "[t]he nonstatutory exemption prevents the antitrust laws from being used to frustrate the primary and legitimate goal of the federal labor law, which is to permit employees to organize and act to improve wages and working conditions."

Union activity is protected from antitrust scrutiny even if it imposes costs on third parties. For example, in Pennington, 381 U.S. 657, 666 (1965), the Supreme Court explained the "a legitimate aim of any national labor organization is to obtain uniformity of labor standards and that a consequence of such union activity may be to eliminate competition based on differences in such standards"; see also R. Posner & F. Easterbrook, ANTITRUST 31 (2d. Ed. 1981) ("The main purpose of labor unions is to raise wages by suppressing competition among workers . . ."). A union organizing campaign is lawful even if it ultimately "reduce[s] the competition that unionized employers face from non-union firms." Connell, 421 U.S. at 625. The Sherman Act is therefore "inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market." MARBA, 675 F.2d at 893, quoting, Consolidated Express, Inc. v. New York Shipping Assoc., 602 F.2d 494, 513 (3d Cir. 1979).

Courts recognize that labor law "sometimes welcomes anticompetitive agreements conducive to industrial harmony." Brown, 518 U.S. at 241. Therefore, an agreement that grows "out of, and [is] directly related to, the lawful operation of the bargaining process" is shielded by the non-statutory exemption. Id., at 236. Notably, "the labor laws give the [National Labor

Relations Board], not antitrust courts, primary responsibility for policing the collective bargaining process" (id. at 242) and for determining "what is or is not a 'reasonable' practice" (id. at 237). In order to avoid application of the non-statutory exemption, a plaintiff must prove conduct operating as a direct restraint upon a business market, as opposed to a labor market. MARBA, 675 F.2d at 893.

There is no evidence in the record that Local 150 imposed any direct restraints on any product or business markets. Local 150 acknowledges that labor costs increased throughout the construction testing industry as a result of collective bargaining between Local 150 and signatory contractors (Facts ¶ 85, 172-173). The higher labor costs undoubtedly impacted the product market; indeed, the higher labor costs may have "affected price competition among competitors," and may have even "reduce[d] the competition that unionized employers face from non-union firms." Connell, 421 U.S. at 622, 625. Such indirect effects on the product market are of concern to the Sherman Act. Plaintiffs' Sherman Act claim is defeated by the non-statutory exemption, as a matter of law.

**B.      Plaintiffs do not have antitrust standing.**

"Over and over," the Seventh Circuit has stressed "that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business." Ehredt Underground, Inc., 90 F.3d at 240. "[A] private antitrust plaintiff does not acquire standing merely by showing that he was injured by defendant's conduct." Midwest Gas Servs., Inc. v. Ind. Gas Co., 317 F.3d 703, 712 (7th Cir. 2003). In fact, "[t]he transfer of a competitor's business to a different competitor, one who is able to more effectively compete in the marketplace, is not an antitrust violation." Midwest Gas, 317 F.3d at 712. This is because "a producer's loss is no concern of the antitrust laws." Stamatakis Indus., Inc. v. King, 965 F.2d 469, 471 (7th Cir. 1992). In this case, Plaintiffs allege that they are "presently limited to doing lower volume and less profitable business in the balance of the

market in Northern Illinois . . ." (Complaint ¶ 12(gg)).  Such an allegation is not sufficient to establish antitrust standing.

To establish antitrust injury, a plaintiff must show consumer harm through raised prices or reduced output, <u>Midwest Gas</u>, 317 F.3d at 712, or that plaintiff was excluded from the market, <u>Serfecz v. Jewel Food Stores</u>, 67 F.3d 591, 598 (7th Cir. 1995).  In <u>Tri-Gen, Inc. v. International Union of Operating Engineers, Local 150</u>, 433 F.3d 1024, 1032 (7th Cir. 2006), the Seventh Circuit held that a company that continued to do business in the same market from which it alleged it was excluded had not established antitrust standing, as a matter of law.  Here, Plaintiffs concede that they continued to work in the market (Facts ¶ 65-72).  Furthermore, customers of Plaintiffs testified that they would continue to seek out and use Plaintiffs' services (Facts ¶ 73-75).  Consequently, Plaintiffs were not excluded, as a matter of law.  <u>Id.</u>  Rather, the undisputed facts show that Plaintiffs voluntarily chose to cease construction materials testing services (GME for a two-year period only; PSI, its Hillside location only) to avoid their employees' desire to be union.  But that decision "lie[s] at the core of entrepreneurial control."  <u>Fibreboard Paper Products Corp. v. NLRB</u>, 379 U.S. 203, 246 (1964) (Stewart, J. concurring); <u>see also</u> <u>Textile Workers Union v. Darlington Mfg. Co.</u>, 380 U.S. 263 (1965) (holding employer has absolute right to terminate entire business even if motivated by desire to avoid union).  Moreover, an independent business decision to cease doing business to avoid a union does not equate to being excluded from a market.  <u>Goldwasser v. Ameritech Corp.</u>, 222 F.3d 390, 397 (7th Cir. 2000) ("Part of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal").

Here, Scott Bierbaum of GME admitted that GME made its decision because GME and Local 150 could not agree on contractual issues (Facts ¶ 57).  Mr. Zyga of MES stated he would not allow a union vote to happen, and that he would never sign with Local 150 and would continue with his lawsuit (Facts ¶ 33-34).  Lastly, Mr. Savage, CEO of PSI, testified that he would like to think that if it was not for Local 150's organizing of the construction materials

10

testing industry that PSI still would have a construction materials testing department at Hillside (Facts ¶ 41).

Additionally, there is no evidence of decreased output for the consumer of construction materials testing services in this record. The record reflects no diminution in the quality of work provided by union firms (Facts ¶ 85). At most, the record reflects that labor costs increased as a result of Local 150's organizing (id.). Increased labor costs (and any price increases attributable to increased labor costs) are not sufficient to confer antitrust standing since union organizing activity that increases wages is exempt from the reach of Sherman Act, as a matter of law. Plaintiffs cannot demonstrate an injury to the consumer and therefore cannot establish antitrust standing, as a matter of law.

### C. Plaintiffs are not entitled to relief under Section 1 of the Sherman Act.

In order to maintain a successful action under Section 1 of the Sherman Act, one must prove: (1) that there was a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and, (3) an accompanying injury. Denny's Marina, Inc. v. Renfro Prod., 8 F.3d 1217, 1220 (7th Cir. 1993).

### 1. Plaintiffs failed to establish a conspiracy.

The Sherman Act does not proscribe independent action. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984). To survive a motion for summary judgment, a plaintiff seeking damages under Section 1 of the Sherman Act must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Seventh Circuit uses a two-part test to determine the existence of a conspiracy: (1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendant's permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests? Market Force Inc. v. Wauwatosa Realty Co., 906 F.2d 1167, 1171 (7th Cir. 1990). In the end, "[a] defendant is entitled to summary

11

judgment when it 'provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy.'" Id. at 1171-72.

Even if this Court finds some ambiguity in Plaintiffs' conspiracy evidence, in order to survive summary judgment, Plaintiffs must still put forward evidence that tends to exclude the possibility of independent action. Id., at 1174. That is, Plaintiffs must exclude the possibility that Local 150 simply was organizing workers and negotiating collective bargaining agreements with union contractors. Moreover, Plaintiffs must exclude the possibility that third parties severed their relationships with Plaintiffs for legitimate business reasons. Ehredt Underground, 90 F.3d at 240 ("[a] buyer of construction services may insist that its contractors have labor agreements with an identified union, to reduce the potential for labor unrest"). There is simply no evidence in this record to suggest that Local 150 entered into any conspiracies with any third-party contractors, developers, owners, or construction managers to the detriment of Plaintiffs (Facts ¶ 87, 89-101, 173). Over and over, time and time again, alleged third parties testified to never even having talked with anyone from Local 150 regarding Plaintiffs in any way, let alone conspired with Local 150 (Facts ¶ 89-101).

Importantly, "an antitrust claim which makes no economic sense can on that ground be dismissed on summary judgment." JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 179 F.3d 1073, 1076 (7th Cir. 1999), citing, Matsushita, 475 U.S. at 587. Local 150 represents workers; it makes no product, provides no service, and derives no profit from the construction services market. In fact, aside from organizing workers (which is lawful), Plaintiffs have failed to allege or cite a single benefit, pecuniary or otherwise, Local 150 stood to gain from its alleged massive attempt to monopolize the construction services industry. Plaintiffs have further alleged that various contractors participated in "sham" bargaining with Local 150 which culminated in high-wage collective bargaining agreements. Developers, owners, and construction managers, and other signatory testing firms then allegedly joined the conspiracy to exclude the lower-priced Plaintiffs from the market. This conspiracy makes no sense. Why would the union testing firms

participate in "sham" bargaining that resulted in higher labor costs? Why would the purchasers of construction testing services (i.e., contractors, owners, and construction managers) seek to exclude the lower-cost providers of construction services (Plaintiffs) from the market, thereby raising their own cost of doing business? See Ehredt Underground, 848 F. Supp. 797, 810 (N.D. Ill. 1994) ("Conspiring to force out low-bid contractor to replace it with a higher cost contractor is contrary [to purchaser of construction services] economic self interest"). Because Plaintiffs' unproven conspiracy allegations make no economic sense, the Court should dismiss them on summary judgment as a matter of law.

2.    Plaintiffs failed to establish an unreasonable restraint.

Plaintiffs allege a "conspiracy to boycott Plaintiffs."[9] "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." Phil Tolkan Datsun, Inc. v. The Greater Milwaukee Datsun Dealers' Advertising Assoc., Inc., 672 F.2d 1280, 1284 (7th Cir. 1982). There is simply no evidence in the record to suggest that any of Plaintiffs' competitors organized a boycott to protect themselves from competition from Plaintiffs.

a.    The *per se* rule is inapplicable.

Even assuming there was a group boycott, Plaintiffs' boycott claim must be reviewed under the rule of reason standard, as opposed to the *per se* rule.[10] Application of the "per se rule in the group boycott context is limited to cases involving horizontal agreements among direct competitors" and is inapplicable in cases involving vertical agreements. NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998). In this case, Plaintiffs allege that Local 150 conspired with various unnamed contractors, developers, owners, and construction managers to boycott Plaintiffs. Local 150 is a labor union; it does not compete with Plaintiffs and could not have entered into a horizontal conspiracy, as a matter of law. At most, Plaintiffs have alleged a vertical conspiracy between Local 150 (a supplier of labor), various testing contractors

---

[9] See Complaint ¶ 70; see also Complaint ¶¶ 66-70.
[10] Plaintiffs have not alleged any of the other *per se* categories.

13

(competitor construction testing firms), and developers, owners, and construction managers (purchasers of construction testing services). Flynn v. Phillip Morris USA, Inc., Case No. 05 C 318, 2006 U.S. Dist. LEXIS 2438 at *11 (N.D. Ill. Jan. 19, 2006) ("Vertical restraints upon competition are those imposed by persons or firms on a different level of the distribution system that the level of the persons or firms receiving the impact of the restraints"). Plaintiffs have alleged that they suffered damages when the purchasers of construction materials testing services severed their relationships with Plaintiffs. See Nynex Corp., 525 U.S. at 135 (*per se* rule inapplicable to vertical restraints, i.e., "a restraint that takes the form of depriving a supplier of a potential customer"). Plaintiffs' boycott claim must therefore be reviewed under the rule of reason.

### b. Plaintiffs' claim fails under the Rule of Reason.

To state a claim under the Rule of Reason, an antitrust plaintiff must show that: (1) the defendant has market power in the relevant market; (2) the defendant's conduct is likely to have adverse effects on competition; and, (3) the antitrust violation will cause injury to the plaintiff. Menasha Corp. v. News America Marketing In-Store, Inc., 354 F.3d 661, 663 (7th Cir. 2004). Plaintiffs failed to establish any of these elements.

### i. Plaintiffs failed to identify the relevant market and offered no economic market analysis.

An antitrust plaintiff must precisely establish a relevant market. Republic Tobacco Co. v. North Atlantic Trading Co., Inc., 381 F.3d 717, 738 (7th Cir. 2004). The relevant market has a product and a geographic dimension. Id. "Within a broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." Minnesota Mining & Manufacturing Co. v. Pribyl, 259 F.3d 587, 603 (7th Cir. 2001), quoting, Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Because the plaintiff bears the burden of proving the relevant market, "to survive summary judgment, the plaintiff must offer admissible evidence that is sufficient for a jury to find that the proposed relevant market is accurate." Menasha Corp. v. News America Marketing In-Store, Inc., 238 F.Supp.2d 1024, 1034 (N.D. Ill.

2003), aff'd 354 F.3d 661 (7th Cir. 2004). Notably, the Seventh Circuit affirmed the lower court's finding in Menasha that Plaintiffs failed to establish the accuracy of the proposed market. 354 F.3d at 664. Particularly relevant to the Court was the fact that plaintiff "introduced no econometric evidence of any kind, even though it . . . presented a lengthy report signed. . . by an economist well suited to provide such evidence if any existed." 354 F.3d at 664.

Plaintiffs' expert in this case was Columbia-educated economist Dr. Glenn D. Meyers. Dr. Meyers produced a lengthy expert report, but conceded that he failed to perform any econometric analysis of the market (Facts ¶ 77). Dr. Meyers failed to conduct the type of rigorous analysis required by the Seventh Circuit. Plaintiffs failed to define precisely any of the relevant markets or submarkets; they also failed to establish with admissible evidence that their description was accurate. Their antitrust claim fails for that reason alone.

### ii. Local 150's conduct had no unlawful effect on competition.

Under the rule of reason a plaintiff must allege and prove anticompetitive effects in the relevant geographic and product market. The Great Escape, Inc. v. Union City Body Co., Inc., 791 F.2d 532, 539 (7th Cir. 1986). "There is no anticompetitive effect when a buyer simply terminates an at-will contract with one supplier and enters into a similar contract with another supplier." Id. at 539-540. In this case, Plaintiffs' lost contracts were almost entirely at-will (Facts ¶ 61, 172). Moreover, "[w]hen the consumers favor a product or practice, and only the rivals squawk, the most natural inference is that the complained-of practice promotes rather than undermines competition. . ." Menasha Corp., 354 F.3d at 663.

Plaintiffs failed to establish any anticompetitive effects in any product or geographic market relevant to this dispute. To survive summary judgment, Plaintiffs must demonstrate that "the restraint on the product market is direct and immediate." Pennington, 381 U.S. 663. Any price increases experienced in the construction materials testing industry were a function of wage increases Local 150 negotiated for its members at the bargaining table. Any price increases were therefore the result of Local 150's position in the labor market, as opposed to the product market.

As such, Plaintiffs cannot establish a direct and immediate restraint on the product market, as a matter of law.

Plaintiffs have also alleged that they lost work to union testing firms as a result of Local 150's organizing campaign. A union may lawfully seek to eliminate the competition its members face from non-union-made goods; a union may also lawfully seek to eliminate differences in labor standards that exist between union and non-union employers. Apex Hoisery, 310 U.S. at 503. In the end, losing business because of a union's lawful primary picket "is simply the price to any employer of a lawful employer-union economic dispute, just as losses that are sustained by employees and a union during a strike represent the price paid on the other side of a dispute." R.J. Corman R.R. Co. v. Local 150, Case No. 00 C 4119, 2000 U.S. Dist. LEXIS 16792 at *6 (N.D. Ill. Nov. 15, 2000) (case attached hereto as Exhibit B). Any losses incurred by Plaintiffs were a result of lawful union conduct occurring within the confines of the labor market, as opposed to the product market.

**D.      Plaintiffs are not entitled to relief under Section 2 of the Sherman Act.**

A union may lawfully monopolize a labor market. MARBA, 675 F.2d at 893. Section 2 of the Sherman Act only restricts the monopolization or attempts to monopolize product markets. Verizon Communications Inc., 540 U.S. 398, 407 (2004). In order to survive summary judgment on their Section 2 claim, Plaintiffs must present admissible evidence to establish: (1) that Local 150 possessed monopoly power in the relevant product market; and, (2) that Local 150 willfully acquired or maintained that power in the relevant product market. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 481 (1992).

**1.      Local 150 does not have monopoly power in any product market.**

"It is logically impossible for [a] union, acting alone, to monopolize or attempt to monopolize" a business market. Genser v. IBEW, Local 134, 522 F. Supp. 1153, 1155 (N.D. Ill. 1981). This is because a union's "relevant market is labor." Id. Plaintiffs have presented no evidence to suggest that Local 150 has the power to raise prices or exclude competition by

directly influencing the product market. Local 150 concedes that it has monopoly power in the labor market. As explained above, however, any price increases experienced in the construction materials testing industry were a function of negotiated wage increases Local 150 obtained for its members at the bargaining table. Any lost business opportunities were the result of independent business decisions made by third parties. Plaintiffs have failed to explain how Local 150 directly controlled prices, restricted output, or excluded competition. Local 150 has no power in any product market.

> **2.** **Local 150 did not attempt to acquire any power in any product market.**

"[T]he possession of monopoly power will not be found unlawful it is accompanied by an element of anticompetitive *conduct*." Verizon Communications, 540 U.S. at 407 [emphasis in original]. Consequently, the second element under Section 2 of the Sherman Act requires a showing of "anticompetitive behavior or abuse of market power." Endsley v. City of Chicago, 230 F.3d 276, 283 (7th Cir. 2000). In other words, "intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means." Id. As explained above, organizing workers, negotiating collective bargaining agreements, and picketing to protest unfair labor practices are protected by the NLRA and are exempt from the reach of the Sherman Act by virtue of the labor exemptions. Therefore, these activities are not anticompetitive, as a matter of law.

That unnamed signatory contractors, developers, owners, and/or construction managers may have severed their relations with Plaintiffs does not somehow bestow or impute market power on Local 150. As explained, it is legitimate and lawful for a business entity to prefer to do business with a union contractor. Ehredt Underground, 90 F.3d at 240. That these entities chose to do business with union firms as opposed to Plaintiffs does not reveal Local 150's intent to obtain or maintain monopoly power in the testing services industry.

17

### III.     Plaintiffs Are Not Entitled to Relief Under Section 303 of the LMRA.

Section 303 of the Labor Management Relations Act provides, "whoever shall be injured in his business or property by reason or [sic] any violation" of Section 8(b)(4) "may sue therefore in any district court of the United States . . . and shall recover the damages by him sustained." 29 U.S.C. § 187. Plaintiffs allege that they are entitled to relief under Section 303 as a result of Local 150's conduct in their dealings with various parties at a host of jobsites. To recover, Plaintiffs must first prove a violation of Section 8(b)(4) at each jobsite. Plaintiffs must then prove that each violation was the proximate cause of any damages sustained. Plaintiffs are not entitled to any damages under Section 303.

#### A.     Local 150 Did Not Violate Section 8(b)(4).

Section 8(b)(4) of the National Labor Relations Act "describes and condemns specific union <u>conduct</u> directed to specific union <u>objectives</u>." <u>Local 761, International Union of Electrical, Radio and Machine Workers v. NLRB</u>, 366 U.S. 667, 672 (1961). Therefore, to prove a violation of Section 8(b)(4), a plaintiff must establish unlawful conduct *and* unlawful motive. <u>UFCW, Local 1776</u>, 334 NLRB No. 73 at *1 (2001) ("There are essentially two elements necessary to establish a violation of Section 8(b)(4)(i) and (ii)(B). . . unlawful conduct and unlawful object"); <u>Pickens-Bond Constr. Co. v. United Bhd. of Carpenters, Local 690</u>, 586 F.2d 1234, 1239 (8th Cir. 1978); <u>Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150</u>, 529 F.2d 1284, 1286 (9th Cir. 1976).

#### 1.     There is no evidence of unlawful conduct.

Section 8(b)(4)(i) prevents a union from inducing or encouraging neutral employees to engage in a strike or concerted refusal to work. <u>Local 761</u>, 366 U.S. at 672; <u>see also</u> 29 U.S.C. § 158(b)(4)(i). For its part, Section 8(b)(4)(ii) is "directed towards what is known as the secondary boycott whose 'sanctions bear, not upon the employer who alone is a party [to the labor dispute], but upon some third party who has no concern in it.'" <u>Id.</u>; <u>Mautz & Oren, Inc. v. Teamsters Local 279</u>, 882 F.2d 1117, 1121 (7th Cir. 1989) (a "union may not exert pressure on

an unrelated, 'secondary' employer").  The statute preserves, however, "the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes . . ." NLRB v. Denver Building & Constr. Trades Council, 341 U.S. 675, 692 (1951).  As used in this rubric, the *primary* employer is the employer with which the union has the dispute; the *neutral* or *secondary* employer (and its employees) is a third party with which the employer has no dispute.

"Primary activity is protected even though it may seriously affect neutral third parties." Landgrebe Motor Transport Inc. v. District 72, Int'l Assoc. of Machinists & Aerospace Workers, 763 F.2d 241, 246 (7th Cir. 1985).  This is because "when the primary and secondary employers share a common work site, it is difficult or impossible to target the primary employer without having a substantial effect on a secondary employer."  Boyd Asphalt, Inc. v. International Union of Operating Engineers, Local 150, AFL-CIO, Case No. 2:00-CV-262 slip op. at 13 (N.D. Ind. January 4, 2002) (case attached hereto as Exhibit C).  Importantly, a threat to engage in lawful primary picketing of a primary employer is likewise protected by the Act.  NLRB v. Servette, 377 U.S. 46, 57 (1964).

Along the same lines, it is lawful for a union to handbill or otherwise notify a neutral employer of an existing labor dispute with a primary employer.  In fact, the Supreme Court has held that mere handbilling (without picketing) is not coercive enough to violate Section 8(b)(4)(ii).  DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades, 485 U.S. 568, 583, 587 (1988).  For example, in Tri-Gen, Local 150 sent a letter to a neutral employer in which it explained, "[w]e are appealing to contractors, customers and other employers in the hope that they will cease using the services of [the primary employer]."  433 F.3d at 1041.  The Seventh Circuit found the letter lawful because it was "aspirational in tone, expressing Local 150's hope to [the neutral employer's] support in its efforts instead of its intent to enmesh [the neutral employer] in its dispute."  Id.  In addition, the Seventh Circuit reasoned that the "letter[] expressly indicated that the picket was not aimed at the [neutral employer] and accurately explained the nature of the primary labor dispute. . ."  Id.  Thus, Section 8(b)(4) "does not reach

informing secondary employers of, or 'threatening' them with, picketing of primary employers, including primary employers scheduled to work at a common job site." J. Pease Constr. Co, Inc. v. Local 150, International Union of Operating Engineers, AFL-CIO, Case No. 87 C 10515, 1992 U.S. Dist. LEXIS 5659 at *28-29 (N.D. Ill. April 7, 1992) (case attached hereto as Exhibit D), citing, NLRB v. Ironworkers Local 433, 850 F.2d 551, 555 (9th Cir. 1988).

There is no evidence that Local 150 ever picketed or threatened to picket any of the neutral employers. Local 150 asked for support from neutral employers by way of the same handbill at issue in Tri-Gen (Facts ¶ 172), as well as an "on-strike" handbill. Deposition testimony reveals that the neutral employers understood Local 150's dispute was with Plaintiffs, not with them (Facts ¶ 78-79, 87-97, 102-111, 114-116, 126-147, 149, 151-157, 166-169). There is simply no evidence that Local 150 ever enmeshed neutrals in its labor dispute with Plaintiffs. Local 150's conduct was lawful.

### 2.    There is no evidence of unlawful motive.

"Almost all picketing, even at the situs of the primary employer and surely at that of the secondary employer, hopes to achieve the forbidden objective, whatever other motives there may be and however small the chances of success." Local 761, 366 U.S. at 673; see also Landgrebe Motor Transport, Inc., 763 F.2d at 246 ("primary picketing always has as one of its goals the inducement of secondary employees to stop handling the primary employer's goods or to take other action against the primary employer"). Consequently, "[s]ome disruption of the business relationships between the primary and secondary employers 'is the necessary consequence of the purest form of primary activity.'" Landgrebe Motor Transport, Inc., 763 F.2d at 246.

Because of the inevitable consequences of common-situs picketing, the Seventh Circuit recognizes "an analytical distinction between *intending* to enmesh secondary employers in a dispute not their own, and acting with knowledge that secondary employers will inevitably be affected by the union's actions." Tri-Gen, 433 F.3d at 1043. "Even if the union's picketing has substantial (*and foreseeable*) secondary effects, that conduct does not violate section 8(b)(4)

20

unless the employer satisfies its burden of establishing that the union intended to cause disruption of the secondary employer's business." Id. [emphasis in original]. For purposes of evaluating motive, it matters not that the conduct affected the secondary employer's business, Landgrebe Motor Transport, Inc., 763 F.2d at 246; that secondary effects were foreseeable, Mautz & Oren, 882 F.2d at 1121; or even that the union hoped to achieve a forbidden objective, Local 761, 366 U.S. at 673. What matters is that the union intended to enmesh a secondary employer into a dispute not his own. Mautz & Oren, 882 F.2d at 1121.

Again, there is no evidence that Local 150 intended to enmesh neutrals in its dispute with Plaintiffs. Here, Local 150's picketing at all times complied with Moore Dry Dock requirements for common-situs picketing. Sailor's Union of the Pacific (Moore Dry Dock), 92 NLRB 547 (1950). Plaintiffs' principals admit as well as neutrals, that Local 150 established pickets (to protest unfair labor practices) when and for as long as Plaintiffs were onsite and working (Facts ¶ 78-80). In all instances of picketing, when Plaintiffs ceased working and left the jobsite, Local 150 ceased picketing (id.).

Additionally, it should be noted that Plaintiffs filed unfair labor practice charges against Local 150 alleging similar, if not identical, violations of 8(b)(4) as alleged here (Facts ¶ 146). The Labor Board concluded (notwithstanding the fact that Plaintiffs later withdrew the charges) that Local 150 had engaged in lawful primary picketing (id.).

**B.     Any alleged damages were not caused by violations of Section 8(b)(4).**

Section 303 requires that there be a causal nexus between the alleged unlawful secondary activity and the injury suffered by the plaintiff. Feather v. United Mine Workers of America, 711 F.2d 530, 537 (3d Cir. 1983), citing, Frito-Lay, Inc. v. Local Union No. 137, Int'l Bhd. of Teamsters, 623 F.2d 1354 (9th Cir. 1980); see also Tresca Brothers Sand & Gravel v. Truckdrivers Local 170, 19 F.3d 63 (1st Cir. 1994). When a "union has engaged in lawful and unlawful conduct, and the consequences of those activities are separable, the union is liable under Section 303 only for injuries proximately caused by the illegal activity." Mead v. Retail

21

Clerks Int'l Assoc., 523 F.2d 1371, 1378 (9th Cir. 1975), citing, United Mine Workers v. Gibbs, 383 U.S. 715; 86 S.Ct. 1130 (1966). In other words, a district court is without power to award damages proximately caused by lawful primary activities, even though a union may have contemporaneously engaged in unlawful acts elsewhere. Local 20, Teamsters v. Morton, 377 U.S. 252, 261-2 (1964); Boxhorn's Big Muskego Gun Club v. Electrical Workers Local 494, 798 F.2d 1016, 1022 (7th Cir. 1986) (court must distinguish between lawful and unlawful conduct "to prevent penalizing unlawful conduct). The causation element is intended "to prevent windfall recoveries by employers negligibly affected by a violation, and protect the union's right to strike for primary objectives. . . ." Mead, 523 F. 2d 1371. Plaintiffs have alleged violations of Section 8(b)(4) at many jobsites. Even assuming Local 150 engaged in unlawful conduct at one or more jobsites, Plaintiffs must undergo a jobsite-by-jobsite analysis and prove that any damages were proximately caused by unlawful acts.

## IV. Plaintiffs Are Not Entitled to Relief Under Their Tortious Interference with Contract Claim and Tortious Interference with Business Relationships Claim.

Plaintiffs base their state torts on the same conduct they allege gives rise to the Section 303 claim; namely, the allegations of unlawful picketing and handbilling. "States may not regulate activities that the NLRA protects, prohibits, or arguably protects or prohibits." Wisconsin Department of Industry v. Gould, 475 U.S. 282, 286 (1986); see also San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245 (1959). Picketing and handbilling are protected by Section 7 of the NLRA and regulated by Section 8(b)(4) of the NLRA. It is for that reason that federal courts routinely dismiss state economic torts based on labor activities (including picketing) that are protected and/or regulated by Sections 7 and 8 of the NLRA.[11]

---

[11] Local 926, IUOE v. Jones, 460 U.S. 669 (1983) (interference with contract claim preempted); Iron Workers v. Perko, 373 U.S. 701 (1963) (tortious interference with a contract claim preempted); Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co., 464 F.3d 651 (7th Cir. 2006) (tortious interference with contract claim preempted); Kaufman v. Allied Pilots Assoc., 274 F.3d 197 (5th Cir. 2001); Ehredt Underground, Inc. v. Commonwealth Edison Co., 90 F.3d 238 (7th Cir. 1996) (tortious interference with contract claim preempted); Richardson v. Krucho & Fries, 966 F.2d 153 (4th Cir. 1992) (IIED and tortious interference with contract claim preempted); In re Sewell, 690 F.2d 403 (4th Cir. 1982) (tortious interference with contract claim preempted); Billy

For example, in <u>American Steel Erectors, Inc. v. Local Union 7</u>, 2006 U.S. Dist. LEXIS 4348 (D. Mass Feb. 6, 2006), Mr. Avakian filed a remarkably similar complaint against a union in Massachusetts. Similar to this Complaint, the complaint in <u>American Steel Erectors</u> alleged violations of the Sherman Act and Section 303, as well as state claims of tortious interference with advantageous contractual and economic relations and the state Fair Business Practices Act. Id. at *3. The complaint in <u>American Steel Erectors</u> also contained repeated allegations of "'top-down organizing' job-targeting, threats to picket, 'sham' picketing, 'wide spread' picketing, work slowdowns, threatened slowdowns, work-stoppages, and the 'stripping of non-union employees." Id. at *13. The district court in <u>American Steel Erectors</u> characterized the laundry list of alleged conduct as "quintessential examples of the types of conduct that are committed by the NLRA to the primary jurisdictional oversight of the NLRB." <u>Id.</u> Consequently, the court held that that the state economic torts were preempted under <u>Garmon</u> and its progeny. <u>Id.</u>

<u>Assuming</u> the state torts are not preempted, this record does not contain evidence sufficient to establish each element of the *prima facie* case of each tort. <u>DSC Logistics, Inc. v. Innovative Movements, Inc.</u>, Case No. 03 C 4050, 2004 U.S. Dist. LEXIS 1412 at *8 (N.D. Ill. Feb. 4, 2004); <u>Comtel Technologies, Inc. v. Solai</u>, Case No. 04 C 3879, 2005 U.S. Dist. LEXIS 8370 at * 33 (N.D. Ill. Feb. 22, 2005). For that reason alone, judgment should be entered for Local 150.

---

<u>Jack for Her, Inc. v. Allied Workers' Union, Local 1-35</u>, 511 F. Supp. 1180 (S.D.N.Y. 1981) (state law claim of tortious interference with contract preempted).

**CONCLUSION**

For all the reasons stated above, this Court should grant Local 150's Motion for Summary Judgment in its entirety.

Date:  June 2, 2008                                    Respectfully submitted,

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO

By:   s/Bryan P. Diemer
      One of the Attorneys for Defendant Local 150

Attorneys for Defendant Local 150:
Dale D. Pierson
Robert E. Entin
Bryan P. Diemer
Charles R. Kiser
IUOE LOCAL 150
LEGAL DEPARTMENT
6140 Joliet Road
Countryside, IL  60525
Ph. 708/579-6663; Fx. 708/588-1647

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, hereby certifies that on June 2, 2008, he electronically filed *Local 150's Memorandum of Law in Support of Its Motion for Summary Judgment* with the Clerk of Court using the CM/CM/ECF system, which sent notification to the following:

Mr. Jeffrey P. Orduno
McGreevy Williams, P.C.
6735 Vistagreen Way
P.O. Box 2903
Rockford, IL  61132

Mr. Michael E. Avakian
3211 Port Royal Road
Suite 103
Springfield, VA  22151

Mr. Gerard Smetana
Smetana & Avakian
39 South LaSalle Street
Suite 1218
Chicago, IL  60603

By:   s/Bryan P. Diemer
        One of the Attorneys for Defendant Local 150

Dale D. Pierson
Robert E. Entin
Bryan P. Diemer
Charles R. Kiser
IUOE LOCAL 150
LEGAL DEPARTMENT
6140 Joliet Road
Countryside, IL  60525
Ph. 708/579-6663
Fx. 708/588-1647

I:\LI\MES, et al.v. Local 150, et al\Pleadings\MSJ\Memorandum of Law\final.doc