**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

Midwest Engineering Services, Inc., )
Professional Service Industries, Inc., )
GME Consultants, Inc., and )
GME Consultants of Illinois, Inc., )
                                 )    Case No. 05 C 50023
        Plaintiffs, )
                                 )    JURY TRIAL REQUESTED
      v. )
                                 )
International Union of Operating Engineers, )
Local 150, AFL-CIO, *et al.*, )
                                 )
        Defendants. )

**LOCAL 150'S RULE 56.1 STATEMENT
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150" or "Union"), submits, pursuant to Local Rule 56.1, this statement of material facts as to which there is no genuine issue and entitles Local 150 to judgment as a matter of law:

**Local 150**

1.    Local 150 is a labor organization representing construction workers and other employees throughout northwest Indiana, northern Illinois and eastern Iowa (Tab 1, Answer to Third Amended Complaint ¶ 3). Its principal offices are located in Countryside, Cook County, Illinois (id.).

2.    William E. "Bill" Dugan is the President/Business Manager responsible for the overall operations of Local 150 (Tab 2, May 30, 2008 Certification of James Sweeney at ¶ 2 (hereafter "Sweeney Cert. ¶ ___")).

3.    Jim Sweeney is the Union's Vice-President, and reports directly to Business Manager Dugan (Sweeney Cert. ¶ 1-2). Sweeney is responsible for the organizing efforts of

Local 150 and is additionally responsible for whatever is assigned him by Mr. Dugan (Sweeney Cert. ¶ 2).

4.     Stan Simrayh is a Local 150's Director of Organizing, reporting directly to Sweeney (Sweeney Cert. ¶ 4; Tab 3, May 30, 2008 Certification of Stan Simrayh, at ¶ 1-2 (hereafter "Simrayh Cert. ¶ ___")).  Simrayh had principle responsibility for the campaign to organize employees in the construction materials testing/drilling industry.

**Plaintiffs, Their Competitors, and Employees all Work in the Construction Industry**

5.     The State of Illinois considers testing companies such as Plaintiffs and their competitors to be construction industry employers.  The Illinois Department of Transportation (IDOT) engineers and managers consider the testing work performed by such companies to be essential to the construction process.  Jeffrey S. Dailey is the Chief Engineer of the Illinois State Toll Highway Authority (ISTHA) (Tab 4, Deposition of Jeffrey S. Dailey conducted October 5, 2005, at 5-6 (hereafter "Dailey Dep. ___")).  Mr. Dailey testified that the ISTHA agreed to include the construction industry testing work under the Tollway's Project Labor Agreement covering all Tollway construction work because they considered it to be "construction-related work" (Dailey Dep. 37-39; <u>see also</u> Tab 5, Deposition of ISTHA Senior Project Manager Subhas Bose conducted October 5, 2005, at 16 (hereafter "Bose Dep. ___"): "…they provide professional services under a no-bid contract.  And all it says is that…these operators send testers to the extent they take place in the field are considered by the Tollway to be construction-related services"; <u>see also</u> Tab 6, Deposition of Robert Jetter conducted October 5, 2005, at 50 (hereafter "Jetter Dep. ___")).  Mr. Bose testified that testing work is part of and essential to the construction process (Bose Dep. 81).

6.     Robert Jetter is a professional engineer who serves as Vice-President of H.W. Lochner, Incorporated, in Chicago (Jetter Dep. 6-8).  Lochner performs engineering work for the

Illinois State Toll Highway Authority (id. at 9). According to Jetter, the testing services performed by the construction materials testing technicians employed by companies such as Lochner are "essential to the process of paving a road or building a tollway" (id. at 95-96). Jetter testified that it was his understanding that the Tollway Authority considered engineering staff to be construction workers and therefore subject to the Tollway's Project Labor Agreement (id. at 50).

7.     Under Illinois state law, the work performed by construction materials testing firms is considered to be construction work within the meaning of the Illinois Mechanics Lien Act. According to Brett Gitskin, owner and President of Environmental Consulting Services (ECS) (Tab 7, Deposition of Brett Gitskin conducted October 27, 2006, at 4 (hereafter "Gitskin Dep. ___")), work performed by materials testing companies such as ECS such as taking physical samples of construction materials such as concrete or soil samples from soil borings is considered "an improvement to the project;" as such, testing companies such as ECS are allowed to file mechanics liens when they are not paid for their services (Gitskin Dep. 163-165). Consequently, Gitskin is required to provide lien waivers to the owner, general contractor, or whomever it is that has hired him on a construction project, just as are other construction industry subcontractors (id.).

8.     Thomas Dobrowski was a Division Manager and head of the Materials Testing and Drilling Department for DLZ Industrial, LLC (Tab 8, Deposition of Thomas Dobrowski conducted September 22, 2006, at 6 (hereafter "Dobrowski Dep. ___")). At the time of his deposition, Mr. Dobrowski was also an assistant professor at Purdue University's College of Engineering and Technology where he taught soils and materials testing among other things (id. at 4-5). Dobrowski described the drilling work performed by DLZ as consisting of a two-man crew, a driller and a helper, who operated a truck-mounted drill rig capable of being driven over

the road (id. at 51-52). Using a hollow-stem auger, soil samples are retrieved from various depths to assist engineers in the design of a building or other structure (id. at 53, 61). Technicians test soil density, concrete, and steel to determine, for example, whether they meet the engineers' specifications (id. at 12, 62). Dobrowski likened the testing and drilling work to that of any other building trades subcontractor like plumbers or electricians (id. at 24, 63), and considered all of them as working in the construction industry (id. at 51).

9. The employees who work as construction materials testing technicians consider themselves construction industry workers. For example, PSI employee Tammy Barker (who has been designated a party representative by PSI in this litigation (see Tab 9, Deposition of J. Behnke conducted October 24, 2006, at 4, hereafter "Behnke Dep. ___")) stated in an affidavit attached to the Third Amended Complaint in this case, "I am employed by PSI where I perform construction services" (Affidavit of Tammy Barker dated February 4, 2005, at ¶ 1). She subsequently testified that she customarily works at construction sites "where other construction workers are working" (Tab 10, Deposition of Tammy Barker conducted July 15, 2005, at 58, hereafter "Barker Dep. ___") (emphasis added). When she arrives at a construction site, Barker is ordinarily required to notify the project superintendent that she will be performing "construction services" there (id. at 60). Like other workers on any given construction site, Barker must wear construction boots, a hard hat, and safety vest as required by OSHA regulations (id. at 58-59). The list of safety equipment required is posted at any given jobsite pursuant to those regulations (id. at 60).

10. The Illinois Prevailing Wage Act (IPWA) authorizes the Illinois Department of Labor to publish and enforce the payment of prevailing wage rates to construction workers employed on publicly funded construction projects. 820 ILCS 130/0.01, *et seq.* In June 2006, Local 150 petitioned the Illinois Department of Labor, objecting to the published notice

4

(Simrayh Cert ¶ 12).   There, Local 150 alleged that the Department's determination did not include the work of soil and material testing for the Illinois counties of Boone, Carroll, Cook, DeKalb, DuPage, Grundy, Kane, Kankakee, Kendall, Lake, Lee, McHenry, Ogle, Will, and Winnebago, Illinois (Simrayh Cert ¶ 12).   On November 21, 2006, the Department of Labor established the following new classifications and prevailing wage rates (Simrayh Cert ¶ 12):

> "Material Tester I: Hand coring and drilling for testing of materials; field inspection of uncured concrete and asphalt.
> $21.55 hourly rate, $7.46 health & welfare, $4.84 pension, $0 vacation, $.17 training"

> "Material Tester II: Field inspection of welds, structural steel, fireproofing, masonry, soil, façade, reinforcing steel, formwork, cured concrete, and concrete and asphalt batch plants; adjusting proportions of bituminous mixtures.
> $26.55 hourly rate, $7.46 health & welfare, $4.84 pension, $0 vacation, $17 training"

These classifications, Material Tester I and Material Tester II, corresponded to the classifications in the Local 150 collective bargaining agreements with the employers in the construction materials testing industry (Simrayh Cert ¶ 12).

11.   The operation of heavy drilling equipment is historically and traditionally within the craft jurisdiction of Local 150 (Sweeney Cert. ¶ 5).   Engineering firms commonly use data collected by testing companies for structural, environmental, or other geotechnical purposes (Sweeney Cert. ¶ 6).   Such testing companies often test construction materials and perform other monitoring activities; they employ workers called field technicians as well as drill rig operators to perform these services (Simrayh Cert. ¶ 3).

12.   The Office of Apprenticeship in the U.S. Department of Labor has the authority to identify and approve training programs in what are known as "apprenticeable occupations" in the construction industry in the United States (Sweeney Cert. ¶ 16).   In 2006, in conjunction with Local 12 of the International Union of Operating Engineers in California, Local 150 sought

5

approval of apprenticeship standards for field technicians in appreticeable occupations referred to as "field technician concrete/masonry inspector," "field technician soil/asphalt inspector," and "field technician steel/welding/fire-proofing inspector" (id.)  On or about December 19, 2006, the U.S. Department of Labor approved those apprenticeable occupations (id.).

13.     On May 6, 1994, the NLRB conducted an election among a bargaining unit of employees of K & S Testing and Engineering, Inc., filed by Local 150 (Tab 11, December 14, 1994 NLRB Decision and Certification of Representation in <u>K & S Testing and Engineering, Inc.</u>).  Ten K & S employees voted in favor of Local 150 while one voted against, with five challenged ballots (id.).  The Employer objected to the election, but the Regional Director of Region 13 of the National Labor Relations Board overruled the objections, and the NLRB denied the Company's exceptions (id.).  On December 14, 1994, the Board certified Local 150 as the exclusive collective bargaining representative of the employees in the following appropriate unit (id.):

> All full-time and regular part-time employees performing work as drill operators, drill helpers and technicians working in the lab or field, employed by the Employer at its facility currently located at 9715 Kennedy Avenue, Highland, Indiana; excluding all clerical employees, secretarial employees, professional employees, guards, and supervisors, as defined in the Act.

14.     Beginning in 2001, Local 150 initiated a comprehensive campaign to organize employees in the testing/drilling industry within Local 150's geographic jurisdiction (Sweeney Cert. ¶ 6).  Stan Simrayh was principally responsible for the campaign, and reported directly to Sweeney (Simrayh Cert. ¶ 4).  Between that time and 2005, Local 150 organized over 600 employees working for over 30 employers (Simrayh Cert. ¶ 4).

15.     Throughout its campaign to organize employees working in the construction materials testing/drilling industry, Local 150 routinely obtained from employees signed

"Authorization Cards" (see, e.g., Tab 12, Authorization Cards; Simrayh Cert. ¶ 5). Those cards

typically said (id.):

> I hereby designate the INTERNATIONAL UNION OF OPERATING ENGINEERS and its subordinate Local Union No. 150 to represent me for the purpose of collective bargaining and in any and all other situations that may arise under the operation of the National Labor Relations Act, and/or with any individual employer where the provisions of the National Labor Relations Act are not involved.

16.     Once Local 150 had obtained Authorization Cards from a majority of the tester

and/or driller employees of any given employer, the Union would routinely ask that employer to

recognize Local 150 voluntarily as the exclusive collective bargaining representative of its

employees under Section 9(a) of the National Labor Relations Act (NLRA) (Sweeney Cert. ¶ 8;

Simrayh Cert. ¶ 6).  Prior to recognition, the Union offered and the employer accepted the

Authorization Cards as proof of support for the Union from a majority of the company's

employees (Sweeney Cert. ¶ 8; Simrayh Cert. ¶ 6).

17.     With the exception of GME, those employers which recognized Local 150 also

executed a collective bargaining agreement with the Union (Sweeney Cert. ¶ 9; Simrayh

Cert. ¶ 6).

18.     On several occasions, employers lawfully declined to recognize Local 150

voluntarily based upon the proffered Authorization Card majority (Sweeney Cert. ¶ 10; Simrayh

Cert. ¶ 6).  On those occasions, the Union exercised its right under Section 9 of the NLRA to

petition the National Labor Relations Board (NLRB) for an election amongst the company's

employees (Sweeney Cert. ¶ 10; Simrayh Cert. ¶ 6).  In those cases, the NLRB conducted an

election and if a majority of the employer's employees voted in favor of Local 150, the Board

certified the Union as the exclusive collective bargaining representative of those employees

(Sweeney Cert. ¶ 10, Ex. B).

19.     According to the United States Court of Appeals for the Seventh Circuit in IUOE Local 150 v. NLRB (Terracon), 361 F.3d 395 (2004), on February 19, 2001, seven driller and driller helpers arrived at work at the Company's Naperville, Illinois, facility accompanied by Local 150's Stan Simrayh and attorney Ken Edwards to demand recognition. Id. at 397. The Local 150 representatives presented signed Authorization Cards from a majority of the Terracon employees, which one of the Company's representatives reviewed and acknowledged accurately represented a majority. Id. The parties discussed terms and conditions of employment of the Terracon employees on two occasions, but the Company later declined to meet further. Id. at 398. The Union filed unfair labor practice charges against the Company for withdrawing recognition; the Regional Office went to complaint on those charges, and an administrative law judge agreed that Terracon had violated the Act by withdrawing recognition after implicitly recognizing the Union as the bargaining representative of its employees. Id. at 398-399. The NLRB, however, reversed. Id. at 399. The Seventh Circuit affirmed the Board's decision, finding that there was no clear and unequivocal evidence that the Company intended to recognize the Union. Id. at 400-402.

20.     Although Terracon prevailed in Local 150's appeal to the Seventh Circuit, Local 150 made it clear it planned to petition the U.S. Supreme Court for Certiorari (Sweeney Cert. ¶ 11). Meanwhile, local Terracon managers apparently began to perceive a business advantage to signing a contract with Local 150 (Simrayh Cert. ¶ 7). Based upon the original Authorization Card majority of Terracon employees and the desire to amicably resolve the litigation between the parties, Terracon ultimately recognized Local 150, the parties signed a collective bargaining agreement, and terminated the litigation (Sweeney Cert. ¶ 11).

21.     On February 5, 2004, the NLRB conducted an election among the employees of Engineering Consulting Services, Ltd. ("ECS"), a majority of whom chose Local 150 to be their

8

exclusive collective bargaining representative (Simrayh Cert. ¶ 8; Tab 13, NLRB Certifications of Representation). Shortly thereafter, the Company and the Union executed a collective bargaining agreement covering the construction materials testing work (Simrayh Cert. ¶ 8).

22.     In 2003, Local 150 organized the employees of STS Consultants, Ltd. (STS) (Sweeney Cert. ¶ 14). In the course of that campaign, STS committed a variety of unfair labor practices and filed a lawsuit against the Union. With the assistance of U.S. Magistrate Judge Edward A. Bobrick, the parties settled the lawsuit (Sweeney Cert. ¶ 14). Shortly thereafter, STS voluntarily recognized Local 150 as the exclusive bargaining representative of the Company's employees under Section 9(a) of the NLRA (Sweeney Cert. ¶ 15). Prior to recognition, the Union offered, and the Employer accepted, proof of the Union's support from the majority of the Company's employees. On April 1, 2004, the Companies and the Union executed a collective bargaining agreement covering the drilling and construction materials testing work (Sweeney Cert. ¶ 15).

23.     Ms. Josephine O'Brien is an owner of O'Brien & Associates (Tab 14, Deposition of Josephine O'Brien conducted October 30, 2006, at 5 (hereafter "J. O'Brien Dep. ___")). Ms. O'Brien understood that Local 150 was trying to get her employees to join the Union, and she is sure that all of her employees talked with Local 150 representatives (id. at 13). Ms. O'Brien testified that there was a court order ordering O'Brien & Associates to go union (id. at 30-31, 39).

24.     Mr. O'Brien currently works at Geo Services and O'Brien & Associates and is Vice-President of O'Brien & Associates (Tab 15, Deposition of Dixon O'Brien conducted October 30, 2006, at 4-5 (hereafter "D. O'Brien Dep. ___")). Mr. O'Brien knows that there were conversations between the Local 150 representatives and O'Brien employees in which Local 150

discussed its desire to be their bargaining representative; and he knows that Local 150 brought his employees lunch (id. at 24).

25.     Mr. O'Brien testified that Local 150 filed unfair labor practice charges against O'Brien with the National Labor Relations Board, and that there was a hearing at the National Labor Relations Board involving O'Brien and Local 150 (D. O'Brien Dep. 45).  Mr. O'Brien believes that Geo Services granted voluntary recognition to Local 150 (id. at 39).

26.     In a Decision rendered March 1, 2004, an administrative law judge of the NLRB found O'Brien & Associates to have committed various violations of the NLRA.  O'Brien & Associates, Inc., Case No. 15-CA-41013, J.D. (ATL)-11-04 (March 1, 2004) (slip op. at 53-54) (Decision attached hereto under Tab 16).  They included termination of employees, threats, and interrogation, all for engaging in union activity.  Id.  Based upon that and other unlawful conduct, the ALJ issued a "bargaining order" against the Company—an extraordinary remedy for particularly egregious employer misconduct which effectively excuses the Union from establishing majority status.  Id.

**MES**

27.     In 2004, Local 150 began to organize MES construction materials testing employees (Tab 17, May 29, 2008 Certification of Thomas Rottman at ¶¶ 4-7 (hereafter "Rottman Cert. ¶ ___")).  Lawrence Zablock is a Regional Manager for MES (Tab 18, Deposition of Lawrence Zablock conducted May 26, 2005, at 5 (hereafter "Zablock Dep. I ___")).  Mr. Zablock first became aware that Local 150 representatives were talking to his employees in the spring of 2004 (id. at 48-49).

28.     In January and October 2005, and then again in June 2006, MES employees signed Authorization Cards in support of Local 150 (Rottman Cert. ¶ 5, Ex. A).  In June 2006, Local 150 filed an election petition with Region 13 of the NLRB (Rottman Cert. ¶ 6).  The

election petition engendered multiple days of hearing (Rottman Cert. ¶ 7).  The election petition was eventually dismissed by the Region given that MES closed its testing operation (Rottman Cert. ¶ 11).

29.     MES employee Mr. Jeffrey Shenoha testified that he voluntarily signed a Union Authorization Card on June 19, 2006, because he wanted to go union, and that he wanted to become a union tester to get the benefits that a friend of his had been receiving as a union tester (Tab 19, Deposition of Jeffrey Shenoha conducted November 6, 2006, at 102, 105 (hereafter "Shenoha Dep. ___")).  Mr. Shenoha also testified that he had some conversations prior to signing the Authorization Card with Local 150 about the benefits of being a union member (id. at 106).

30.     Mr. Robert Kagay, an MES employee, testified that he signed an Authorization Card for Local 150 voluntarily because he thought it would be a good idea to do so (Tab 20, Deposition of Robert Kagay conducted November 6, 2006, at 62-63 (hereafter "Kagay Dep. ___")).  Prior to signing that Authorization Card, Mr. Rottman of Local 150 spoke with him more than once about why it is a good idea to join the Union, and all those conversations were always cordial (id. at 63).  In general, Mr. Rottman told Mr. Kagay about the benefits of the Union, such as pension, health and welfare, different rates of pay (id. at 64).

31.     Mr. Zyga is the President of MES (Tab 21, Deposition of Edward Zyga conducted July 14, 2005, at 6 (hereafter "Zyga Dep. I ___")).  During a meeting with Mr. Shenoha in June 2006, Mr. Zyga stated that he does not have any problems with unions, but he does not want any of those "goons" telling him how to run his business (Shenoha Dep. 85).

32.     Mr. Kagay testified that he and Mr. Shenoha told Mr. Zyga that they wanted to have a union vote (Kagay Dep. 38).  Mr. Kagay testified that he and Mr. Shenoha told Mr. Zyga

that there were other guys that felt the same way that they did and that they wanted to have a vote (id.).

33.     Mr. Zyga testified in response to MES employees Jeff Shenoha's and Bob Kagay's hope that MES would consider signing with Local 150 that it was his intention to not sign with Local 150, and his full intention was to proceed with the present lawsuit (Tab 22, Deposition of Ed Zyga conducted October 31, 2006, at 36 (hereafter "Zyga Dep. II ___").

34.     Mr. Kagay testified that Mr. Zyga informed him that MES was not interested in a union contract (Kagay Dep. 46), and that after Jeff Shenoha asked for a union vote, it was then that Mr. Zyga announced that he was going to shut down the construction materials testing services (id. at 56).  Mr. Zyga testified that he is aware of unfair labor practice charges being filed against MES by Local 150 (Zyga Dep. II 65-70).  Mr. Shenoha told Mr. Zyga that he wanted to go union, to which Mr. Zyga responded, "But you're asking me to give up my lawsuit, and I'm not going to do that." (Shenoha Dep. 86-87).  Mr. Zyga then stated that a vote would never happen, and he was not going to sign with Local 150 because he had too much invested in his lawsuit (Kagay Dep. 38).

35.     MES made the decision to close its construction materials testing operations at its Oak Forest office on Wednesday, June 21, 2006 (Tab 23, Deposition of Lawrence Zablock conducted June 26, 2006, at 18-19 (hereafter "Zablock Dep. II ___")).  It provided a "WARN Act" letter to its employees that stated in part that it "filed this lawsuit because it is unethical and creates a conflict of interest for technician employees…to be considered in the construction industry and therefore capable of being organized" (Tab 24, June 21, 2006 MES Warn Act Letter).

36.     Mr. Shenoha testified that it is his belief that he no longer works for MES because he was fired for trying to have a union vote, and that to the best of his knowledge, there were

unfair labor practice charges filed with the NLRB over his firing (Shenoha Dep. 128). Local 150 filed unfair labor practice charges against MES over MES's firing of Jeffrey Shenoha and Robert Kagay, as well as MES's termination of its construction materials testing services (Rottman Cert. ¶ 9).

37.     Mr. Zablock told Mr. Mike Concannon from Henry Bros. that because they had lost two of their key employees and because of the pressure from Local 150 on various jobs that MES would no longer be able to provide viable services (Zablock Dep. II 65).

38.     MES's April 2006 profit and loss statement showed that the Oak Forest and Merrillville offices were profitable in April and May of 2006, and showed that the Schaumburg office was profitable in May 2006 (Zablock Dep. II 169-170).

39.     Local 150 handbilled customers of MES to apprise them of Local 150's labor dispute with MES and to appeal for their support (Rottman Cert. ¶ 14; Tab 25, Handbills).

**PSI**

40.     Local 150 attempted to organize PSI's construction materials testing employees at PSI's Hillside location (see Tab 12).

41.     Murray Savage is the Chief Executive Officer for PSI (Tab 26, Deposition of Murray Savage conducted September 15, 2005, at 6 (hereafter "Savage Dep. ___")). Mr. Savage testified that he would like to think that if it was not for Local 150's organizing of construction materials testers, that PSI would still have a construction materials testing department at Hillside (id. at 71).

42.     John Balun is the Branch Manager for PSI's Elgin office at 665 Tollgate Road, Elgin, Illinois (Tab 27, Deposition of John Balun conducted June 1, 2005, at 6 (hereafter "Balun Dep. I ___")). Mr. Balun is aware that Local 150 representatives have had conversations with all of the employees in the Elgin shop (id. at 104).

13

43.     In 2004, Local 150 gave Ms. Tammy Barker a blank Authorization Card and a copy of the construction materials tester collective bargaining agreement and a summary plan description of the Union's health and welfare program (Barker Dep. 124-125, 134-135).

44.     Jason Venezia was a field technician for PSI at the Elgin office (Tab 28, Deposition of Jason Venezia conducted July 20, 2005, at 16-18 (hereafter "Venezia Dep. ___")). Mr. Venezia was approached by Local 150 Representative Jim Schweihs who, according to Mr. Venezia, was trying to rally the PSI employees to join the Union (id. at 177). In 2004, a Local 150 representative showed Mr. Venezia a copy of the construction materials technicians collective bargaining agreement (id. at 106).

45.     Jim Chism, a PSI employee, signed an Authorization Card with Local 150 in the fall of 2004 (Tab 29, Deposition of Jim Chism conducted August 12, 2005, at 152-182 (hereafter "Chism Dep. ___"); see also Tab 12). Mr. Chism had nothing but friendly conversations with Local 150 representatives (id. at 141, 186).

46.     Mr. Timothy Dunne is a construction materials technician (Tab 30, Deposition of Timothy Dunne conducted August 16, 2005, at 7 (hereafter "Dunne Dep. ___")). Representatives of Local 150 in June and July 2004 attempted to engage Mr. Dunne in a conversation regarding the benefits of joining Local 150 (id. at 131-133).

47.     Local 150 filed unfair labor practice charges ("ULPs") against PSI (Tab 85, May 29, 2008 Certification of Michael Aprile at ¶ 8 (hereafter "Aprile Cert. ¶ ___")). The NLRB dismissed the ULPs (Aprile Cert. ¶ 8).

**GME**

48.     William Kwasny is the President of GME (Tab 31, Deposition of William Kwasny conducted May 25, 2005, at 8 (hereafter "Kwasny Dep. ___")). In

March 2002, Mr. Kwasny first learned that Local 150 representatives were meeting with his employees and attempting to organize GME (id. at 68, 137).

49.     In February and March 2002, all of GME's construction materials testing employees signed Authorization Cards supporting Local 150; and, Local 150 made a demand for voluntary recognition and forwarded to GME a copy of the proposed collective bargaining agreement (Aprile Cert. ¶¶ 3-6; Tab 32, Local 150 April 9, 2002 Proposal to GME).

50.     Scott Bierbaum is GME's Division Manager for the Bridgeview, Kankakee, and Rockford, Illinois, GME offices (Tab 33, Deposition of Scott Bierbaum conducted June 29, 2005, at 7, 12 (hereafter " I ___")). Mr. Bierbaum was aware that there was a union organizing drive going on in the construction materials testing industry and had a couple of staff meetings with GME employees to discuss that fact (id. at 83). Mr. Bierbaum further testified that Local 150 attempted to organize GME employees, and that he knows this because he attended three meetings with Local 150 representatives in March, August, and September 2002 (id. at 72-73).

51.     In May 2002, Mr. Kwasny, along with Scott Bierbaum, the Bridgeview office Shop Manager for GME, and John Bowen, attorney for GME, attended a meeting with Local 150 representatives (Kwasny Dep. 72-74), at which GME presented a counterproposal to a collective bargaining agreement that Local 150 had sent to Mr. Kwasny prior to the May 1, 2002 meeting (id. at 79; Bierbaum Dep. I 79-81; Tab 34, GME May 2002 Counterproposal; see also Tab 86, Plaintiffs' Answers to Defendant Local 150's First Requests for Admissions (hereafter "Plaintiffs' First Admissions") No. 2). Mr. Kwasny understood that the purpose of the May 2002 meeting was to negotiate a contract covering the employees performing field service work in Illinois (Kwasny Dep. 80-81).

15

52.     Mr. Bierbaum testified that GME approached Local 150 to negotiate an agreeable contract, and that one of the issues they had with the contract was whether or not it was ethically correct that a technician being represented by Local 150 could still perform his/her duties in an unbiased manner being that he/she was in the same union that other employees on the jobsite were members of (Tab 35, Deposition of Scott Bierbaum conducted June 14, 2006, at 121-122 (hereafter "Bierbaum Dep. II ___")).

53.     GME submitted information to Local 150 pursuant to a Local 150 information request in 2002 (Bierbaum Dep. I 86-87).

54.     In August 2002, Mr. Kwasny, along with Scott Bierbaum and John Bowen, met again with the Union (Kwasny Dep. 93).  James Sweeney and Tony Opila, an employee of GME, were present for the Union (id. at 93-94).

55.     In September 2002, Kwasny met again with Local 150 (Kwasny Dep. 106).  The purpose of the September 2002 meeting with Local 150 was to discuss the shutdown of the testing services in Chicago, which employees were going to be laid off, and what sort of severance package was going to be presented to the employees (Bierbaum Dep. I 132-136; Tab 36, Deposition of Scott Bierbaum conducted June 15, 2006, at 241 (hereafter "Bierbaum Dep. III ___")).

56.     Local 150 filed four unfair labor practice charges against GME over GME's bargaining behavior (id. at 97-98; Aprile Cert. ¶ 8).

57.     After receiving the Union's information request and unfair labor practice charges, Mr. Kwasny began to think about shutting down the construction materials testing business in July 2002 (Bierbaum Dep. I 104-105).  At the August 2002 meeting between GME and Local 150, GME's attorney notified Local 150 that they made the decision to shut down, and that they were not satisfied that Local 150 was bargaining in good faith (id. at 106-107).  Around

16

September 2002, GME in fact decided to discontinue its field technicians work in Illinois (Kwasny Dep. 116). According to Mr. Bierbaum's testimony, GME was clearly trying to do some bargaining, tensions were rising, and that Mr. Kwasny did not want to deal with somebody who would constantly force something else and would not look at his counteroffer (Bierbaum Dep. I 108). Mr. Bierbaum stated that the reason for terminating construction materials services in 2002 was based upon the lack of ability of the Union and GME to come to an agreement on contractual issues (Bierbaum Dep. II 119-121). According to its Second Amended Complaint, GME decided to "withdraw from the Chicago market" (Complaint ¶ 13(g)).

58.     Local 150 never picketed GME (Bierbaum Dep. I 105).

59.     This work in the Chicago area resumed in the fall of 2005 (Bierbaum Dep. II 94).

60.     Local 150 handbilled customers of GME to apprise them of Local 150's labor dispute with GME and to appeal for their support (Aprile Cert. ¶ 10; see also Tab 25).

61.     GME's contracts for construction materials testing work were terminable at will (Bierbaum Dep. I 161).

## **Complaint Allegations**

### **Alleged Target Money and Funds**

62.     Mr. Savage, PSI CEO, has no personal knowledge that Local 150 paid money to any of PSI's competitors or to owners or clients of PSI so that a Local 150 signatory could successfully bid on a project (Savage Dep. 88-89). Mr. Balun, PSI Elgin Shop Manager, has no knowledge of any target funds (Balun Dep. I 76-77).

63.     Mr. Zyga, President of MES, has no knowledge of any target fund money being paid to any MES competitors who eventually became Local 150 signatories (id. at 56-57).

64.     Mr. Bierbaum of GME has no direct knowledge of any target funds or money (Bierbaum Dep. I 139-140).

**Alleged Exclusion from the Marketplace**

65.     Mr. Balun testified as a 30(b)(6) witness that the PSI Elgin office has bid and currently has projects in the City of Chicago (Tab 37, Deposition of John Balun conducted June 2, 2006, at 30, 31, 77, 102 (hereafter "Balun Dep. II ___")).  PSI's project logs and bid logs also show PSI bidding and working in the alleged relevant market (Tab 64, PSI Project/Bid Logs).  In 2006, Ted's Montana Grill, a project in Schaumburg, was awarded to PSI (id. at 50).  PSI worked at the Lincoln Park Zoo upon renovation in 2006 in Chicago and completed the project (id. at 69).

66.     Mr. Balun testified that he bids work as far east as Lake Michigan, but prefers to keep his employees out of Chicago because of travel problems (Balun Dep. II 77).  PSI has bid and received work in McHenry County and is performing construction materials testing work in McHenry, Lake, Kane, and Cook Counties (id. at 90, 100).  PSI is currently performing construction materials testing work in Kendall County and has done construction materials testing work in Ogle and Will Counties, and has bid work in Stevenson County (id. at 106, 107).

67.     In 2006, PSI Elgin bid construction materials testing work and geotechnical work in Lake County, Indiana (Balun Dep. II 111-112).  Mr. Balun testified that PSI did not get removed from the DeKalb Oasis (id. at 147, 149).  MES never stopped bidding work in McHenry County (Zablock Dep. II 142).

68.     It is possible that at the time it shut down, MES was conducting construction materials testing in McHenry County (Zablock Dep. II 143).  At the time of the shutdown in June 2006, MES had been working in Lake County and it was possible that they were conducting construction materials testing work in Lake County (id.).  At the time of the shutdown, MES had bid work in DeKalb County (id. at 144).  At the time of the shutdown, MES had bid work in Kane County and was probably working in Kane County at that time (id.).  At the time of the

18

shutdown, MES had bid work in Cook County and was doing work in Cook County (id. at 144-145). At the time of the shutdown, MES had bid work in Downtown Chicago, and prior to the shutdown, MES was providing construction materials testing services in Downtown Chicago on more than one project (id. at 145, 147). One of those projects was the Wick's store on Elston Avenue in Chicago (id. at 149).

69. MES, prior to the shutdown, was working and had bid work in DuPage County (Zablock Dep. II 149-150). Prior to the shutdown, it is possible that MES had bid work in Kendall County (id. at 150). Prior to the shutdown, MES bid and was working in Will County (id.). Prior to the shutdown, MES was working in Indiana (id. at 151). MES's project logs and bid logs also show MES bidding and working in the alleged relevant market (Tab 65, MES Project/Bid Logs).

70. Mr. Balun testified that PSI is performing work for the City of Elgin currently on a bridge project (Tab 38, Deposition of John Balun conducted July 20, 2006, at 277-278 (hereafter "Balun Dep. IV ___")). Mr. Gibbs of Tishman Construction testified that PSI is on the list of construction materials testing companies that he might recommend to owners, but Gibbs does not recall recommending them recently (Tab 39, Deposition of Greg Gibbs conducted August 16, 2006, at 31 (hereafter "Gibbs Dep. ___")). Mr. Pryor of Osman testified that Osman would consider using MES on future testing projects (Tab 40, Deposition of Dale Pryor conducted September 21, 2006, at 42 (hereafter "Pryor Dep. ___")). Mr. Swiatowiec testified that he would consider taking a bid from MES in the future (Tab 41, Deposition of Michael Swiatowiec conducted September 27, 2006, at 59 (hereafter "Swiatowiec Dep. ___")).

71. Mr. Kurnick is the Geotechnical Manager for MES at its Oak Forest location (Tab 42, Deposition of James Kurnick conducted October 17, 2006, at 7 (hereafter ". ___")).

Since June 21, 2006, MES has received requests for proposals for construction materials testing work (id. at 113).

72.     Mr. Bierbaum made a decision not to bid on Turner projects (Bierbaum Dep. I 190), and declined bidding work for the University of Chicago and Northwestern University (id. at 197-199).  GME has been bidding work and performing work in the market as alleged by Plaintiffs since 2002.  As of June 14, 2006, GME was still providing construction materials testing Downtown Chicago (Bierbaum Dep. II 18, 91).  McClier has asked GME to bid work since 2002, but GME has declined because according to Mr. Bierbaum, he was not capable of providing the services they asked for due to staffing needs (id. at 183).  Since the Summit, LLC, Perryville Place project identified in the Complaint, Turner Construction has requested GME to bid work, and GME has turned down those bid requests (Bierbaum Dep. I 65-67). GME's project logs and bid logs also show GME bidding and working in the alleged relevant market (Tab 66, GME Project/Bid Logs).

73.     Mr. Breunlin, Vice-President of Robert H. Anderson, would consider using PSI for soil boring work and geotechnical investigations (Tab 43, Deposition of Doug Breunlin conducted September 29, 2005, at 54 (hereafter "Breunlin Dep. ___")).

74.     Mr. Becker is the Engineering Inspector for the Engineering Division of Public Works for the City of Elgin (Tab 44, Deposition of Bill Becker conducted September 30, 2005, at 5 (hereafter "Becker Dep. ___")).  It is Mr. Becker's understanding that PSI currently has a contract with the City of Elgin (id. at 9).  Mr. Becker believes that the City of Elgin would use PSI today for work (id. at 26).

75.     Mr. Kresinske is not aware of any decision by ORIX to not allow MES to bid on future projects, and contrary to the Complaint, Mr. Kresinske does not recall telling Mr. Zablock

that ORIX would not be able to use MES in the future (Tab 69, Deposition of Edward Kresinske conducted April 26, 2006, at 61, 85 (hereafter "Kresinske Dep. ___")).

**Alleged 8(e) Agreements in Restraint of Trade**

76.     Plaintiffs' expert, Dr. Glenn Meyers, conceded in his deposition that there are no written agreements to restrain trade in this case (Tab 46, Deposition of Dr. Glenn Meyers conducted September 18, 2007, at 138 (hereafter "Meyers Dep. ___"); see also Plaintiffs' First Admissions No. 1).

**Market Analysis**

77.     Plaintiffs' expert, Dr. Glenn Meyers, admitted that he did not do any econometric analysis to determine the relevant market (Meyers Dep. 131).

**Alleged Unlawful Picketing**

78.     It is Mr. Zablock's understanding that if the MES individual was not onsite and working, Local 150 stopped its picketing (Tab 47, Deposition of Lawrence Zablock conducted September 14, 2006, at 419 (hereafter "Zablock Dep. VI ___")).  Mr. Zablock, in discussions with Messrs. Bianchini and Clumpner regarding how to minimize any labor disruption, stated that it was his experience that if MES left the jobsite, the picketers would go away (id. at 458-459).  Local 150 picketed the Building II project when MES was onsite and working, and stopped picketing when MES left (Swiatowiec Dep. 37-39).  MES performed construction materials testing work for the Pacific Garden Mission project (Zablock Dep. II 38).  When a picket was established at the Pacific Garden Mission project, there was an MES employee onsite (id. at 44-46).  Mr. Peterson testified that when MES left the jobsite at Pacific Garden Mission, Local 150 took down its picket (Tab 48, Deposition of Roger Peterson conducted October 24, 2006, at 27 (hereafter "Peterson Dep. ___")).  MES bid on and was awarded the Auto Zone project in Markham, Illinois, in Cook County in the spring of 2006 and began to work

on that project in the spring of 2006 (Zablock Dep. VI 413-417). Picketing occurred on the site in May 2006 when there was an MES individual working on the jobsite (id. at 419).

79.　　No one ever told Scott Bierbaum that Local 150 was picketing to replace non-union companies with Local 150 signatories; that is just the result of Local 150's picketing (Bierbaum Dep. I 188-189). Mr. Balun in the spring of 2005 observed Local 150 picketing at the reserve gate established for PSI while a PSI technician was onsite and working at the Wal-Mart project in Batavia (Balun Dep. IV 104).

80.　　Mr. Balun testified that generally when a Local 150 employee is picketing a PSI jobsite, a PSI employee is present and working (id. at 137).

**Alleged Violence**

81.　　Mr. Zablock has no knowledge of any violence directed towards MES or MES employees or any customers or clients of MES (Zablock Dep. I 90-95).

82.　　Mr. Balun is unaware of any physical or verbal threats of violence from a Local 150 representative directed towards any of PSI employees, PSI customers, or of any damage to PSI property or PSI employees' property (Balun Dep. I 112-113). No one from Local 150 has ever threatened Mr. Venezia with physical violence or threatened PSI customers with physical violence (Venezia, Dep. 248).

83.　　Mr. Kwasny has no knowledge of any violence by Local 150 directed at any GME employees, GME property, GME customers, or clients (Kwasny Dep. 171-176).

**Alleged Increased Cost/Diminished Output**

84.　　Krusinski Construction Co. was the general contractor on the ORIX Real Estate Capital Windgate Distribution Center (Tab 45, Deposition of John Krusinski conducted November 8, 2006, at 4, 6, 7 (hereafter "Krusiniski Dep. ___"). MES was working for ORIX; H.H. Holmes was working for Krusinski (id. at 11). John Krusinski, project superintendent for

Krusinski Construction, spoke to a Local 150 business agent, but he did not remember what was said in the conversation (id. at 23). Krusinski never saw a handbill or a list of Local 150 signatory testers (id. at 16-18). There was no work stoppage or picketing at the project (id. at 23-25). Krusinski believed that the parties worked something out (id. at 24-25). Krusinski did not recall if MES finished the project (id. at 18). Krusinski confirmed that testing firms are a part of the construction process (id. at 23).

85.     Mr. Swiatowiec, Director of Engineering for Land and Lakes Development Company, testified that the increased cost for using Terracon was due to an increase in labor costs, that being the hourly wage of the testers (id. at 53). Mr. Swiatowiec testified that the quality of Terracon's work for Land and Lakes was fine (id. at 56).

86.     State Testing is in the materials testing business (Behnke Dep. 34). Jay Behnke is the President of State Testing (id. at 17-18). State Testing entered into a collective bargaining relationship with Local 150 in April or May of 2005 (id. at 75). Since that time, the quality and volume of State Testing's work remained constant (id. at 82). In addition, State Testing's prices did not increase as a result of its collective bargaining relationship with Local 150 (id. at 82).

**Handbilling**

87.     Mr. Mamola is a field superintendent for Osman Construction (Tab 49, Deposition of Edward Mamola conducted October 10, 2006, at 6 (hereafter "Mamola Dep. ___")). Mr. Mamola testified that a Local 150 business agent left him a Local 150 leaflet on orange paper (id. at 17). Mr. Mamola testified that all the business agent said to him was "I cannot talk about this. I'm just dropping off this paperwork. You need to give Jim Sweeney a call." (id. at 19).

88.     Mr. Callaghan testified that Henry Bros. has in its possession a handbill that identifies Local 150's labor dispute with MES (Tab 50, Deposition of William Callaghan

23

conducted April 24, 2006, at 20 (hereafter "Callaghan Dep. ___")).  Mr. Callaghan testified that Henry Bros. had not made a decision to stop using MES (id. at 15; Plaintiffs' First Admissions No. 8).

## Alleged Conspiracies

89.     Mr. Swiatowiec is the Director of Engineering for Land and Lakes Development Company (Swiatowiec Dep. 3).  Mr. Swiatowiec never had any conversations with anyone from Local 150 regarding MES, and never had any specific conversations with Local 150 regarding replacement of MES (id. at 57).  Land and Lakes stopped using MES to avoid a work-stoppage (id. at 19).

90.     Mr. Eljaiek is a project manager for Walsh Construction (Tab 51, Deposition of Roberto Eljaiek conducted September 27, 2006 at 3-4 (hereafter "Eljaiek Dep. ___")).  Mr. Eljaiek was never approached by anyone from Local 150 and asked to enter into agreements to use only union testing agencies on Walsh Construction projects (id. at 67), and never had any conversations with Local 150 about recommending Terracon to do any testing work on Walsh projects (id. at 67-68).  Mr. Eljaiek has no knowledge of anyone from Local 150 having a conversation with anyone from the Pacific Garden Mission project regarding terminating MES (id. at 71).

91.     Mr. Pryor is the Corporate Vice-President, Corporate Secretary, and General Project Manager for Osman Construction (Pryor Dep. 7).  Mr. Pryor is not aware that Osman has any agreements with Local 150 to use only union testing firms (id. at 41).  Mr. Pryor does not believe anyone from Local 150 ever contacted Osman and said that Osman had to choose someone off of its signatory list to replace MES (id.).  No one from Local 150 ever told Mr. Mamola, Field Superintendent for Osman Construction, he had to remove MES from the jobsite, and no one told him that he had to use a union tester on the jobsite (Mamola Dep. 34).

24

92.     Mr. Peterson is a project superintendent for Walsh Construction (Peterson Dep. 4).  Mr. Peterson does not recall having any conversations with anyone from Local 150 that related to the testing company that was onsite at the Pacific Garden Mission project (id. at 26).  Mr. Peterson attempted to speak with a Local 150 individual at the MES Pacific Garden Mission project, but that the Local 150 individual did not speak to him and simply handed him a business card (id. at 16).  Mr. Peterson testified that the easiest solution for getting the Local 150 pickets down and away from his jobsite was to ask MES to leave (id. at 17).

93.     Mr. Kincaid, Project Manager at Frederick Quinn, testified that he did not have any contact with anyone from Local 150 regarding the Plainfield High School project, and that he is not aware of Local 150 approaching anybody at the Plainfield site regarding MES (Tab 52, Deposition of Bruce Kincaid conducted October 31, 2006, at 5-6, 21, 22 (hereafter "Kincaid Dep. ___")).  Mr. Kincaid testified that he does not take into account whether or not a firm is signatory to a union or not when he makes a recommendation to a client regarding construction materials testers (id. at 16).

94.     Mr. Crane is the Superintendent for Reed of Illinois (Tab 53, Deposition of Jay Crane conducted November 9, 2006, at 3-4 (hereafter "Crane Dep. ___")).  Mr. Crane testified that he never had any conversations with anyone from Local 150 informing him that they had to replace MES, and that he simply received and interpreted a document that was given to him by Local 150 (id. at 48-49).

95.     Mr. Breunlin is the Vice-President for Robert H. Anderson & Associates, a consulting engineering firm in St. Charles, Illinois (Breunlin Dep. 5).  Mr. Breunlin was the project manager for the City of Batavia's Pine Street improvement project in 2005 (id. at 8-11).  Mr. Breunlin is not aware of any agreements that Local 150 has with Robert H. Anderson & Associates (id. at 54).  Local 150 did not play any role in TSC getting the Pine Street project

25

work (id. at 55); no one from Local 150 contacted Mr. Breunlin and suggested that work be given to TSC (id.); Local 150 never provided Robert H. Anderson & Associates with a list of contractors to use (id.); and, no one from Local 150 has contacted and spoken to Mr. Breunlin at any time (id. at 51).

96.    Mr. Becker did not have any communications with anyone from Local 150 and did not talk with anyone from Local 150 as it relates to any picketing of PSI by Local 150 and has no knowledge of anyone from Local 150 telling the City of Elgin to stop doing business with PSI (Becker Dep. 12, 20).

97.    Mr. Callaghan is the Executive Vice-President of Henry Bros., Inc. (Callaghan Dep. 5).  No agent of Local 150 ever contacted Mr. Callaghan regarding MES, and he is unaware that any agent from Local 150 contacted anyone from Henry Bros. (id. at 10-11), and there is no agreement between Henry Bros. and Local 150 not to use MES (id. at 21).  Mr. Callaghan has never called Mr. Sweeney, and he is not aware of any of his project superintendents or project managers talking with any business agents from Local 150 (id. at 30-31).  Mr. Callaghan testified that Henry Bros. wanted to avoid any labor dispute (id. at 33-36).

98.    Allen DuBose is the president of TSC, a company involved in geotechnical engineering, construction materials testing and observation, and environmental testing (Tab 54, Deposition of Allen DuBose conducted October 26, 2006, at 4, 7 (hereafter "DuBose Dep. ___")).  Although originally a non-union company, TSC made a business decision to seek Union-signatory status once their competitors signed contracts with Local 150 (id. at 16, 24, 30-31, 100).  DuBose found Local 150's vision for an apprenticeship program for testers an advantage of signatory status (id. at 34-35, 79, 98, 105, 107).  Before the parties commenced negotiations, Local 150 showed DuBose authorization cards executed by a majority of his employees (id. at 37).

26

99.     DuBose never attended any meetings with Local 150 where the Union discussed non-union testing firms (DuBose Dep. 78).  Local 150 never promised TSC more work should it voluntarily recognize the Union (id.).  Local 150 never picketed, pressured, threatened, intimidated, or coerced TSC employees into extending voluntary recognition or coerced any employee into signing authorization cards (id. at 83, 101-102).  TSC has no written or verbal agreement with Local 150 to exclude a non-union testing company from the market (id. at 111).

100.     George Slater is the President of the DuPage County Building and Construction Trades Council (Tab 55, Deposition of George Slater conducted December 6, 2006, at 44 (hereafter "Slater Dep. ___")).  As of the date of his deposition, Mr. Slater had never heard of MES, PSI, GME Consultants, or GME Consultants of Illinois (id. at 62).  At no time did any agent of Local 150 ever talk to Slater about picketing MES, PSI, or GME, and at no time did any agent of Local 150 ever ask Slater to do anything in the context of picketing those companies (id. at 62).

101.     Tom McTavish is the President of the McHenry County Building and Construction Trades Council (Tab 56, Deposition of Tom McTavish conducted December 6, 2006, at 4 (hereafter "McTavish Dep. ___")).  As of the date of his deposition, McTavish had never heard of MES, PSI, GME, or GME Consultants of Illinois (id. at 46-47).

## Alleged Lost Projects

### Summit, LLC/Perryville Place

102.     Ms. Ashlesha Nigam is one of the owners of Summit, LLC (Tab 57, Deposition of Ashlesha Nigam conducted September 22, 2006, at 7 (hereafter "Nigam Dep. ___")).  Ms. Nigam never hired GME to work on the Summit project (id. at 73).  At no time did Ms. Nigam or Summit, LLC, advise GME Consultants that they were awarded the Summit

Perryville Place project (Tab 58, April 28, 2005 Affidavit of Ashlesha Nigam at ¶ 10 (hereafter "Nigam Aff. ¶ ___")).

103.    Ms. Nigam never heard that Local 150 had told Turner that her job would be picketed if they continued to use GME on the project (Nigam Dep. 78).  Ms. Nigam has never had any contact with any agents of Local 150 and has no idea who Mark McCaffrey is (Nigam Aff. ¶ 12).

104.    There are no agreements between Local 150 and Summit, LLC (Nigam Aff. ¶ 16).

105.    Summit's decision not to award GME the testing work at the Perryville Place project was not the result of any threats, coercion, or intimidation by Local 150 (Nigam Aff. ¶ 17).  Summit, LLC, has not refused to award work to GME, much less refused to do so as a result of involvement, contact, or interference by Local 150 (id. at ¶ 19).  The decision to hire Sjostrom & Sons as the general contract with the Perryville Place project had nothing to do with Local 150 (id. at ¶ 24).

**Soldier Field**

106.    Ms. Hoffman is the President of Hoffman Management Partners and was in that position at the time of the Soldier Field project (Tab 59, Deposition of Alice Hoffman conducted November 8, 2006, at 16 (hereafter "Hoffman Dep. ___")).  Ms. Hoffman testified that there was going to be a project labor agreement on the project from the beginning because they needed to avoid strikes on the project because of the short scheduling (id. at 144).  Ms. Hoffman's involvement with the PLA was that she recommended to the Bears that they have one to avoid a strike (id. at 162).  Ms. Hoffman did not draft any part of the PLA (id.).  Ms. Hoffman testified that she recommended to the Bears that they have a PLA to avoid any labor disruption due to her experience with the Baltimore Ravens Stadium construction (id. at 167-168).  Ms. Hoffman testified that to her knowledge there is a no-strike clause in the PLA (id. at 168).

28

107.    Ms. Hoffman testified that she did not personally have any discussions with anyone from a labor union concerning the project labor agreement that is in place covering the Soldier Field project (Hoffman Dep. 96).

108.    Ms. Hoffman testified that she did not have any communication from Local 150 regarding removing PSI from the jobsite, and she did not have any communication with Local 150 regarding a signatory list of contractors that she should use instead of PSI (Hoffman Dep. 107). Ms. Hoffman testified that she did not have any communication with Mr. Dugan of Local 150 and that she had no verbal discussions concerning the dispute with anyone from Local 150 (id. at 109). Ms. Hoffman testified that she had no recollection that she ever had any discussions with anyone from Local 150, and it is fair to say that at no time did she discuss with anyone from Local 150 the removal of PSI from the Soldier Field project (id. at 167).

109.    Ms. Hoffman testified that the reason PSI was terminated from the project was because there was a project labor agreement in place that required firms to be party to union agreements and that PSI would not agree to do that (Hoffman Dep. 102).

110.    Mr. Parkinson is a partner with Hoffman Management (Tab 60, Deposition of Andrew Parkinson conducted November 8, 2006, at 4 (hereafter "Parkinson Dep. ___")). Mr. Parkinson testified that he had several conversations with Tom Palansky of PSI around February 2002 regarding PSI acknowledging and working with the project labor agreement in place on the Soldier Field project (id. at 49). Mr. Parkinson testified that it was the failure of PSI to be able to acknowledge the PLA and incorporate it into their contract that resulted in their not getting the Soldier Field project; it was not pressure from organized labor (id. at 70-71, 81). Mr. Parkinson testified that he did not have any role in drafting the PLA in place on the Soldier Field project (id. at 114). Mr. Parkinson testified that during his involvement with the Soldier Field project, he did not have any conversations with anyone from Local 150 (id.).

Mr. Parkinson testified that there was no pressure put on him or Hoffman Management Partners to not use PSI (id. at 115).

111.    Hayes testified that PSI was not going to sign the PLA (Tab 61, Deposition of Richard Hayes conducted September 11, 2006, at 281 (hereafter "Hayes Dep. ___")).  "The Bears said, and the powers to be said there's a PLA and you're either on it or you're off.  And if you're on it, you're on the job.  If you're not on it, you're not on the job.  PSI made the decision not to sign or join.  That decision was solely in their court" (id.).  Hayes had no knowledge of threats or an agreement between Local 150 and any other members of the joint venture to exclude PSI (id. at 285).

112.    Mark Weiland is the General Counsel, Vice-President, HR Director, and Corporate Secretary of PSI (Tab 62, Deposition of Mark Weiland conducted July 21, 2005, at 46 (hereafter "Weiland Dep. ___")).  When Walter Flood met with Weiland shortly after Flood Testing lost a representation election, Weiland did not consider Flood to be a competitor of PSI (id. at 118).  Weiland has not had any conversations with any Local 150 signatory contractors (id. at 140).  Local 150 did not picket PSI at Soldier Field (id. at 162).  Weiland does not believe that Local 150 threatened to picket Hoffman, the general contractor, on that job (id. at 163).  Weiland has never spoken to anyone at Local 150 (id. at 167).

**Osman Construction**

113.    Mr. Mamola testified that he contacted Jim Sweeney and asked him to send Mr. Mamola a list of signatory contractors to Dale Pryor (Mamola Dep. 15-16).   To Mr. Peterson's knowledge, he never received any materials from Local 150 via facsimile (Peterson Dep. 20).

**City of Batavia**

114.     Local 150 established a picket against PSI at the Pine Street project in Batavia when PSI was present (Breunlin Dep. 52). There was a meeting on the Pine Street jobsite involving Tim Dunne, Karen Young, John Ferrante, Terry Alter, John Kennedy, and Quentin Jefferson for IDOT; no one from Local 150 was present at this meeting (id.).

115.     Karen Young is a staff engineer for the City of Batavia (Tab 63, Deposition of Karen Young conducted October 6, 2005, at 4 (hereafter "Young Dep. ___")). Batavia hired PSI for the 2004 Street Program (id. at 13, 16). In August, Plote Construction, the general contractor, informed the City that its employees were unlikely to cross a Local 150 picket of PSI (id. at 18). In consultation with the Plote representatives and the City attorney, Batavia ultimately decided to replace PSI (id. at 24, 30). Plote suggested that the City contact TSC or State Testing to finish PSI's work (id. at 30-31). Plote never directed the City to terminate its contract with PSI (id. at 83).

116.     Young never spoke with a Local 150 representative or received anything from the Union pertaining to its labor dispute with PSI (Young Dep. 22, 31, 70, 79, 84; Plaintiffs' First Admissions No. 17). The Local 150 picketers did not threaten Young (id. at 84-85). Young understands that Local 150 has no dispute with the City of Batavia, and the Union never threatened to picket the City (id. at 88). Young never saw a list of Local 150 signatory contractors (id. at 96).

**Illinois Tollway**

117.     Mr. McPartlin is the Chief Administrator of the Illinois State Tollway Authority (Tab 67, Deposition of Brian McPartlin conducted October 5, 2005, at 5 (hereafter "McPartlin Dep. ___")). Mr. McPartlin received a telephone call from Jim Sweeney who only stated that work being done on one of the Tollway's projects was not in compliance with the project labor

31

agreement (PLA) covering Tollway work (id. at 45, 48). Thereafter, the Tollway Engineering Department made the decision that there was not compliance with the PLA (id. at 49).

118. Mr. McPartlin testified that neither Mr. Sweeney nor Mr. Simrayh asked that a Local 150 signatory list be attached to a Tollway letter that went out to contractors working on the Tollway (McPartlin Dep. 100), and that he asked for the list to be attached (id. at 101).

119. Mr. McPartlin is not aware of PSI having lost any Tollway work as a result of the PLA (McPartlin Dep. 112). He is also not aware of GME or MES losing any work as a result of the PLA (id.).

120. Mr. Balun of PSI believes that there was no picketing at PSI's Tollway projects (Balun Dep. II 149).

121. Jeffrey Dailey is the Chief Engineer for the Illinois Tollway Authority (Dailey Dep. 6). Mr. Dailey requested a list of Union signatories from Local 150 (id. at 9). In 2004 to 2005, Mr. Dailey received telephone calls from Mr. Sweeney who stated that there were non-union testers on Tollway projects (id. at 10). In 2004, the Tollway began to have discussions about the fact that more and more of the testing companies were becoming unionized (id. at 11). The Tollway initiated an executive-level meeting on how to proceed (id.).

122. In late 2004, the Tollway Authority initiated a change in its policy to include construction materials testing under the PLA (Dailey Dep. 11-16). The PLA is now interpreted to require a tester to be affiliated with an AFL-CIO Building and Construction Trades union; it does not require a tester firm to be signatory with Local 150 (id. at 47). In the executive-level meetings discussing the inclusion of construction materials testing work within the PLA, the Tollway discussed the fact that testing was construction-related because testing is necessary in order to do construction work (id. at 38).

32

123.    Mr. Sweeney never threatened to picket the Tollway in any phone calls that he made to Mr. Dailey regarding the fact that there were non-union testers on a Tollway jobsite (Dailey Dep. 41). Mr. Dailey never received notice that Local 150 may be on strike against any particular tester (id. at 43). Mr. Dailey testified that he requested a list of union signatory tester companies from Chicago trade unions (id. at 47).

124.    In 2004, when the Tollway was discussing including construction materials testing work under the PLA, the meetings involved discussions about wanting to avoid labor unrest (Dailey Dep. 42).

125.    Mr. Dailey testified that Local 150 did not participate in any meeting that Dailey had about construction materials testers and that Local 150 did not play any role in the decision of the Tollway to include testing work under the PLA (Dailey Dep. 42).

**Henry Bros., Inc.**

126.    Mr. Deaton is a foreman for Henry Bros. operating engineer employees (Tab 68, Deposition of Steven W. Deaton conducted April 24, 2006, at 5 (hereafter "Deaton Dep. ___")). Contrary to the Complaint, Mr. Deaton testified that he had no knowledge of how much dollar volume business that MES did with Henry Bros. in any given year, nor of telling MES that they would not do business with MES unless they signatory, and that he has no authority to tell anyone that Henry Bros. would not do business with them (id. at 8). Mr. Deaton did not remove MES from any Henry Bros. jobsite (id. at 16), and does not have a list of Union-approved testing firms (id. at 20).

**Wind Gate Distribution/ORIX Real Estate Capital**

127.    Mr. Kresinske is a project manager and Vice-President at ORIX Real Estate Capital (Kresinske Dep. 6-7). Mr. Kresinske testified to a conversation he had with Stan Simrayh of Local 150 at a project known as the Wind Gate Distribution Center in Romeoville,

Illinois (id. at 12-17). Mr. Simrayh indicated to Mr. Kresinske they were using a non-union testing firm and that he would like ORIX to use a union company, and that most of the testing firms had gone union (id. at 18). Mr. Simrayh never said that Mr. Kresinske had to get rid of MES; Mr. Simrayh simply appealed for support from his company; and, that Mr. Simrayh never said that the Company had to use union people (id. at 20, 23). Mr. Simrayh never threatened to picket this Wind Gate Distribution Center, and a picket was never established at the jobsite (id. at 19). At no time during the conversation did Mr. Simrayh ask Mr. Kresinske to break his contract with MES (id. at 32). Mr. Kresinske testified there was no picketing at the Wind Gate project and that Mr. Simrayh was very amiable and pleasant during their conversation (id. at 63). Mr. Kresinske never felt threatened by Mr. Simrayh at the jobsite (id. at 98). MES was never removed from the Wind Gate Distribution Center project and was paid in full for the project (Plaintiffs' First Admissions No. 15).

128. Mr. Kresinske looked into finding a potential union testing firm, and it was MES that offered the name of such company (Kresinske Dep. 21). It was Mr. Kresinske's idea to use union employees, and it was Zablock who identified Great Lakes (id. at 24). At no time did anyone from Local 150 contact Mr. Kresinske about which testing company to use, and it was MES through Mr. Zablock that reached out for Great Lakes, a unionized testing company (id. at 23, 24). Mr. Kresinske testified that no one from Local 150 ever said they had to use someone off of the signatory list (id. at 54).

129. There was no agreement ever made with Local 150 for ORIX not to use MES on the jobsite and no agreement between ORIX and Local 150 to contract construction materials testing only with union firms, and there is no agreement with Local 150 to not use MES, and it is Mr. Kresinske's decision not to use MES in certain situations (Kresinske Dep. 26, 59, 87).

34

130.    Mr. Kresinske testified that if Kresinske had work in a non-union area in Illinois, he would take a proposal from MES; but if there was an area where there was a majority of union contractors, Kresinske would not choose to use MES because MES is not unionized (Kresinske Dep. 62).

131.    Krusinski Construction Co. was the general contractor on the ORIX Real Estate Capital Wind Gate Distribution Center (Krusinski Dep. 4, 6, 7).  MES was working for ORIX; H.H. Holmes was working for Krusinski (id. at 11).  John Krusinski, project superintendent for Krusinski Construction, spoke to a Local 150 business agent, but he did not remember what was said in the conversation (id. at 23).  Krusinski never saw a handbill or a list of Local 150 signatory testers (id. at 16-18).  There was no work stoppage or picketing at the project (id. at 23-25).  Krusinski believed that the parties worked something out (id. at 24-25).  Krusinski did not recall if MES finished the project (id. at 18).  Krusinski confirmed that testing firms are a part of the construction process (id. at 23).

**Concrete Structures of the Midwest, Inc.**

132.    Mr. Moberly is a project manager for Concrete Structures of the Midwest, Inc. (Tab 70, May 10, 2005 Certification of Tom Moberly at ¶ 1 (hereafter "Moberly Cert. ¶ ___")). Mr. Moberly testified that he has had no contact with Local 150 in the seven years he had been a project manager for Concrete Structures and is not aware of any contact between Concrete Structures and Local 150 regarding the Park Ridge Reservoir and Pump Station project (id. at ¶ 7); that Local 150 played no role in his decision not to use MES at the Park Ridge Reservoir and Pump Station project (id. at ¶ 8); and, that Local 150 has not played any role in any decision to award or not to award MES any subsequent work (id.).

35

**Winnebago County Criminal Justice Center**

133. Mr. Burdett is the Project Director for Winnebago County, Illinois, and is responsible for the oversight of the construction of the Winnebago County Criminal Justice Center in Rockford, Illinois (Tab 71, August 23, 2006 Certification of Gary Burdett at ¶ 2-3 (hereafter "Burdett Cert. ¶ ___")). There is a project labor agreement in place on the Winnebago County Criminal Justice Center project (id. at ¶ 4). The County's decision to award the construction materials testing work on the Winnebago County Criminal Justice Center project to Terracon was not the result of any threats, coercion, or intimidation by Local 150 (id. at ¶¶ 8, 10). Mr. Burdett does not recall receiving a list of Union signatory construction materials testing companies from Local 150 (id. at ¶ 11). Mr. Burdett is not aware of any written, oral, or other type of agreement with Local 150 which precludes the County from using PSI or any other non-union testing firm to provide construction materials testing services on County construction projects (id. at ¶ 13).

**Central DuPage Hospital**

134. Mr. Abbott worked for Garrison, Inc., from 1998 to 2003 as a project manager (Tab 72, Deposition of Bryan Abbott conducted July 12, 2006, at 22 (hereafter "Abbott Dep. ___")). Mr. Abbott testified that he talked to various construction materials testing companies and told them what was of primary importance to him was the need to avoid any kind of work-stoppages on the site, and that it was not prudent for a client to have one or two testers on a jobsite and have that jobsite shut down because of those testers (id. at 46-47). Mr. Abbott further testified that he had no recollection of ever having a conversation with Local 150 (id. at 47). Mr. Abbott made the decision to replace GME at the Central DuPage Hospital project, and that again he had no contact from Local 150, that no one from Local 150 contacted him and told him that he should replace GME on the jobsite (id. at 71-72).

36

135.    Mr. Abbott further testified that he had never seen or executed a written agreement with Local 150 that stated his company could not use GME, and further testified that he had no contact from or written agreements with Local 150 (Abbott Dep. 78).

136.    Mr. Abbott testified that a union workforce is a great knowledgeable workforce and knows how to do things together, how to put a job together, and if you want to get your job done, it is a very knowledgeable workforce, and he has enjoyed working with those groups of guys and gals (Abbott Dep. 81-82).  Mr. Abbott testified that the wage rates for union testing companies are higher than those for the non-union companies (id. at 114-116).

137.    Mr. Abbott testified that he would recommend GME in the future and has in fact done so since the Central DuPage Hospital project (Abbott Dep. 84).

138.    The Local 150 picketing that occurred at the Woodridge Commons jobsite occurred when PSI personnel were present (Balun Dep. IV 225-226).

**Plainfield High School**

139.    Mr. Ellanardo is the Vice-President of Construction for Frederick Quinn Corporation (Tab 73, Deposition of Damien Ellanardo conducted August 11, 2006, at 6 (hereafter "Ellanardo Dep. ___")).  Mr. Ellanardo testified that in 2004, it was apparent that the labor climate in Chicago changing regarding construction materials testing, and he knew that the trade was becoming organized (id. at 28).  Mr. Ellanardo testified that his company was attempting to make sure that his projects were not impacted (id. at 29).

140.    Mr. Ellanardo testified that Frederick Quinn has no written agreements with Local 150 not to use non-union construction materials testing companies (Ellanardo Dep. 30).  Local 150 never asked Frederick Quinn not to use MES (id. at 37).  Mr. Ellanardo testified that he does not agree with the statement attributed to Zablock that Frederick Quinn had an agreement with Local 150 to let MES finish the project if they would only use union testing labs in the future (id.

at 48). Mr. Ellanardo also testified again that Frederick Quinn had no agreement with Local 150 to use union testers over non-union testers, and that if Frederick Quinn chooses to use a union firm over a non-union firm, it is simply the desire to avoid any potential labor disruption on the jobsite (id. at 76).

141. Mr. Ellanardo terminated MES from the Plainfield High School project because he wanted to avoid labor disruption, and there was an issue that MES was not paying the prevailing wage on the job (Ellanardo Dep. 37-38; Tab 74, September 1 and November 29, 2004 letters from Ellanardo to Lawrence Zablock of MES). Mr. Ellanardo testified that Local 150 did not specifically play a role in the decision to remove MES from the project (Ellanardo Dep. 39). Mr. Ellanardo testified that no one from Local 150 told him that Frederick Quinn could not do business with MES unless they were signatory with Local 150 (id. at 45). Mr. Ellanardo testified that he did not remember receiving a signatory list from Local 150 (id. at 47). Mr. Ellanardo testified that there was no decrease in the quality of work done by Terracon at the Plainfield High School project, and that he was pleased with the work that they did (id. at 76). Mr. Ellanardo testified as well that Local 150 has never threatened any kind of labor disruption on the jobsite (id. at 77).

**Tishman/Grand on Grand**

142. Mr. Gibbs is currently the Vice-President of Tishman Construction (Gibbs Dep. 7). Mr. Gibbs does not recall having received any phone call from anyone from Local 150 regarding construction materials testing work on the Grand on Grand project (id. at 25). Additionally, Mr. Gibbs did not meet with anyone from Local 150 where construction materials testing work on the project was discussed (id.). Mr. Gibbs does not recall there being any picketing on this jobsite (id.), and does not recall any work-stoppages related to any kind of labor issues at this jobsite; he does not recall that Local 150 at any time threatened to picket the

jobsite; he does not recall that he received documentation from Local 150 indicating that it had a labor dispute with PSI; and, he does not recall receiving a list of union signatory construction materials testing companies from Local 150 (id. at 26).

143.   To his recollection, since 2003, Mr. Gibbs has not had any conversation with anyone from Local 150 regarding construction materials testing work (Gibbs Dep. 30). Mr. Gibbs does not have a list of union signatories to consult when putting together a group of construction materials testing companies that he might recommend to a client (id. at 36-37). Mr. Gibbs testified that the fact that a testing company is signatory versus non-signatory does not play any role when Mr. Gibbs makes a recommendation of potential testing companies to an owner (id. at 41).

144.   Mr. Gibbs testified that to his knowledge, Tishman does not have any written agreements with Local 150 not to recommend PSI for construction materials testing work, and they do not have any written agreements with Local 150 not to use PSI directly for construction materials testing work (Gibbs Dep. 80).  Also to Mr. Gibbs' knowledge, Tishman does not have any agreements with Local 150 not to recommend non-union materials testing companies (id. at 80-81).

* * *

145.   Local 150 has picketed PSI and MES to protest unfair labor practices (Tab 75, Picket Signs).

146.   In June 2005, Plaintiffs filed charges with Region 13 of the NLRB alleging that Local 150 was engaging in unlawful secondary picketing to obtain 8(e) agreements; had obtained 8(e) agreements; had unlawfully picketed to seek 8(f) recognition (Tab 76, Plaintiffs' June 2005 ULP Charges).  The NLRB dismissed the ULPs, finding that Local 150 had engaged in lawful

primary picketing to protest unfair labor practices and that there was insufficient evidence of any 8(e) agreements (Tab 77, June 30, 2005 NLRB Dismissal Letter).

* * *

147.    Mohammad Sadeki, Vice-President of Tishman, told Hayes that it would not use PSI on the 200 West Grand project because PSI was non-union, but that PSI was free to submit a bid (Hayes Dep. 99).   Hayes was not aware of any threat to Tishman by Local 150 or an agreement to exclude PSI (id. at 103).

**Horseshoe Casino**

148.    GME did not lose the Horseshoe Casino project, and worked and completed the project.  There was never a Local 150 picket on the project (Bierbaum Dep. I 163-164), and DLZ did not replace GME on the Horseshoe Casino project (id. at 165).

**McClier/AECOM**

149.    Mr. Mitchell is the Senior Project Manager for AECOM (Tab 78, Deposition of August Mitchell conducted July 19, 2006, at 7-8 (hereafter "Mitchell Dep. ___")).   To Mr. Mitchell's knowledge, no one from McClier or Austin AECOM has ever had any conversations with Local 150 regarding the Kennedy King project (id. at 27-28).  Mr. Mitchell is unaware of any agreement with Austin and Local 150 or any agreement whereby McClier or Austin has to use a union testing company (id. at 29).

**Auto Zone**

150.    Mr. Zablock has no knowledge of anyone from Local 150 approaching anyone from Cornerstone Commercial, who was the general contractor on the Auto Zone site, and speaking to them about entering into any sort of agreement to use only union testers on the project (Zablock Dep. VI 422).

**Power Construction**

151.     Thomas Nordeen is the Vice-President of Field Operations and General Superintendent for Power Construction Company (Tab 79, Deposition of Thomas Nordeen conducted September 19, 2006, at 5-6 (hereafter "Nordeen Dep. ___")).  Mr. Nordeen never had any conversations with Stan Simrayh relating to any Power Construction project that PSI was working on (id. at 15), and further testified that he had never received a list of Local 150 signatory testing firms (id. at 17-18).  Mr. Nordeen testified that he had never had a conversation with Jim Sweeney regarding the use of non-union testing firms on Power projects (id. at 19).

**Kane County/Fabyan Parkway**

152.     Thomas Edward Gill, III, is the Vice-President of K-Plus Engineering (Tab 80, Deposition of Thomas Edward Gill, III, conducted September 29, 2005, at 4 (hereafter "Gill Dep. ___")).  In April 2005, Local 150 picketed PSI at the Fabyan Parkway project for unfair labor practices at the designated reserved gate (id. at 11, 26-27, 29-30, 36).  According to Gill, the Union was not picketing K-Plus, which he admits had no labor dispute with Local 150 (id. at 30).  Despite the pickets, the scheduled concrete pour was completed (id. at 10).  Local 150 picketed only when PSI was present at the jobsite (id. at 33).

153.     In order to avoid problems with a subsequent concrete pour, Kane County and K-Plus chose to remove PSI from the project (Gill Dep. 15-16, 26, 35).  K-Plus chose State Testing, a Union contractor, from a list that he was given from a tollway project (id. at 15-17).  He did not receive that list from Local 150 (id. at 33).  Local 150 did not ask K-Plus to remove PSI and he did not hear the Union threaten anyone working behind the picket (id. at 35).  Gill would consider PSI again for a project (id. at 36).

154.     David Boesch is the Chief of Construction for Kane County, and in that position, he is in charge of all major construction projects in the County (Tab 81, Deposition of

David Boesch conducted October 6, 2005, at 6 (hereafter "Boesch Dep. ___")). Boesch observed Local 150 picketing of PSI at the Geneva Commons Improvement project between August and September 2004, at the Fabyan Parkway project between April and August 2005, and at the Randall/Fabyan improvement for a Geneva K-Mart in 2005 (id. at 20, 22, 23). Kane County replaced PSI with State Testing, but Boesch was not involved with or has personal knowledge as to why Kane County made that decision (id. at 27, 32, 37). Boesch was satisfied with State Testing's work (id. at 27).

155. Boesch never had any contact with Local 150 about the picketing (Boesch Dep. 30, 53). Boesch is unaware of any written or oral agreement with Local 150 and Kane County regarding replacing PSI in exchange for removing the pickets (id. at 33). Local 150 never sent Kane County any documents regarding its labor dispute with PSI (id. at 35). The Union never asked Kane County to remove PSI from any project (id. at 54). Boesch never saw any list providing Union contractors (id. at 50-51). Boesch would hire PSI again to do work for the County (id. at 53).

**Schaumburg Convention Center**

156. William Dean Wilkerson is a project director for HDC, which managed the design and construction process for the Schaumburg Convention Center (Tab 82, Deposition of William Dean Wilkerson conducted July 17, 2006, at 12-13 (hereafter "Wilkerson Dep. ___")). On or around April 7, 2004, MES sent an e-mail to HDC, requesting to be considered to perform the testing services for the project (id. at 53). After discussions with the Village of Schaumburg and Walsh Construction, the general contractor, HDC informed MES that, although they could make a proposal, the Convention Center likely was to be a union job (id. at 61, 63). The Village, in its sole discretion, decided that it did not want the risk of a work stoppage, and accordingly,

42

would limit its selection to Union signatory contractors (id. at 61, 69, 102, 113, 115). Walsh never demanded a union-signatory testing firm (id. at 57, 138).

157. Wilkerson never discussed or exchanged any correspondence with Local 150 about the project, and has no knowledge whether the Village had any conversations with the Union (Wilkerson Dep. 71, 83). Local 150 never picketed or handbilled the jobsite prior to the Village's decision to consider only signatory contractors (id. at 72). Local 150 never threatened HDC to only use Union contractors (id. at 92). Ultimately, Flood received the testing work, a relationship Wilkerson considered successful and whose work was "good" (id. at 81). Wilkerson would not hesitate to accept future bids from MES or PSI (id. at 86, 87).

**Gilbane**

158. Gilbane was the original general contractor on the U of C Residence Halls; Gilbane originally awarded the testing work to PSI (Hayes Dep. 87-88). Turner replaced Gilbane as general contractor, and would not hire a non-union testing firm (id. at 89-91). Richard Hayes testified that he has no knowledge of any agreement between Local 150 and Turner to exclude PSI. Hayes did not know if the Union threatened Turner over PSI or if Local 150 ever gave a list to Turner of signatory testing firms (id. at 92-94).

**Mesirow Stein**

159. Hayes testified that Mesirow Stein will only hire Union-testing firms (Hayes Dep. 113). Hayes had no knowledge of any agreements between Mesirow Stein and Local 150 to exclude PSI. Hayes had no knowledge of any threats and/or other pressure (id. at 118-119).

**Dollar Tree Distribution Center**

160. Hayes conceded that there were no agreements to exclude PSI from the Dollar Tree Distribution Center project (Hayes Dep. 132). Clancy & Theys did not cancel national contracts or tell PSI that it could not bid other work in other areas (id. at 134).

**McCormick Place West**

161.    PSI received the environmental portion on the McCormick Place West project, but was rejected for construction materials testing by Mesirow Stein because of the PLA (Hayes Dep. 148, 150-151).    STS received geotechnical work due to knowledge of soils.    Hayes acknowledged that hiring STS was a "smart decision" and had nothing to do with PSI's non-Union status (id. at 153-154).    Hayes had no knowledge of any pressure applied to any of the general contractors on that project by Local 150 (id. at 155, 160).    Hayes acknowledged that all unions, not just Local 150, were involved in demand for PLA (id. at 156-157).    Hayes was unaware of any agreement excluding PSI (id. at 160, 165).    Hayes directly contradicts Complaint allegation/interrogatory answers (id. at 162-164).

162.    O'Neil, the general contractor on the U505 project, desired to hire a union firm (Hayes Dep. 169).    PSI proposed the need to establish reserve gates, which was rejected (id. at 169, 172, 176).    Hayes was unaware of any agreement (id. at 177).

163.    Flood was low bidder on the State Place project (Hayes Dep. 184).    Hayes was unaware of any agreement, pressure, coercion, or threats made by Local 150 (id. at 185-186).

164.    Walsh was originally interested in hiring PSI for the Heritage project, but then informed PSI that it could not do the work (Hayes Dep. 187).

165.    PSI did early due diligence (Hayes Dep. 192).    When Walsh became the general contractor, PSI decided against bidding the job (id. at 196, 203).    RFP had provision requiring firms to be union (id. at 201-202).    Hayes had no knowledge of any pressure or threats from Local 150, or the existence of any agreements (id. at 204).

**City of Joliet**

166.    The Aux Sable Creek Basin Wastewater Treatment Plant and the Aux Sable Wastewater Treatment Plant refer to the same project (Tab 83, Deposition of Dennis Duffield

conducted June 28, 2006, at 9 (hereafter "Duffield Dep. ___")). The City of Joliet hired MES to perform construction testing services on that project (id. at 9, 16). Local 150 never asked the City of Joliet to enter into an agreement with Local 150, and, in fact, the City of Joliet never entered into an agreement with Local 150 wherein it agreed not to do business with certain contractors (id. at 23). Local 150 never picketed or threatened to picket the project (id. at 18, 19, 39-41). Local 150 never handbilled the City of Joliet (id. at 23-24).

167.    Dennis Duffield, Director of Public Works and Utilities for the City of Joliet, testified that he understood Local 150 was trying to organize MES; its dispute was with MES, not the City of Joliet (Duffield Dep. 18-19). Mr. Duffield testified that Local 150 never interfered with the City's decision-making process (id. at 23). After the City of Joliet removed MES from the Wastewater Treatment project, the City of Joliet considered MES for work on subsequent municipal projects (id. at 25-26). The City of Joliet prefers hiring unionized contractors (id. at 39-40).

**St. Charles Water Treatment Plant**

168.    Trotter and Associates hired PSI to work on the St. Charles Water Treatment Plant (Tab 84, Deposition of Scott Trotter conducted August 3, 2006, at 11, 13, 18 (hereafter "Trotter Dep. ___")). PSI finished that project without interruption (id. at 18-19).

169.    PSI also performed work for Trotter and Associates on the East Dundee Waste Water Treatment project (Trotter Dep. 20). Trotter and Associates changed the scope of PSI's proposal in the spring of 2006 (id.). No one from Local 150 ever talked to Scott Trotter, President of Trotter and Associates (id. at 5, 20-21). Local 150 picketed PSI at the East Dundee Waste Water Treatment project in the spring of 2006 (id. at 21). No one from Local 150 ever told Mr. Trotter, to remove PSI from the project (id. at 22). Mr. Trotter never received a handbill from Local 150 (id. at 23-24).

170.    PSI performed work for Trotter and Associates after the East Dundee Waste Water Treatment project (Trotter Dep. 24).  No one from Local 150 ever asked Trotter and Associates to enter into a contract, and Trotter and Associates has, in fact, never entered into a contract with Local 150 wherein it agreed not to do business with certain contractors (id. at 26).

* * *

171.    Most of MES's contracts for construction materials testing services were terminable at will (Zablock Dep. II 50).

172.    Local 150's Notice to Managers and Supervisors handbill that it provided to customers an clients of Plaintiffs is identical to (except for name of Plaintiffs) the handbill it used in the Tri-Gen case (Sweeney Cert. ¶ 17).

173.    Local 150 has switched objectives from organizing Plaintiffs, to protesting their failure to pay area standards, to protesting their alleged commission of unfair labor practices.  At all times, with respect to Plaintiffs, Local 150 has acted unilaterally and in its own interest to organize, to protest a failure to pay area standard wages and benefits, to promote union labor, and to protest unfair labor practices (Sweeney Cert. ¶ 18).

174.    Local 150 never maintained or used a so-called job-targeting program as part of its campaign to organize field technicians/drillers in the construction materials testing industry (Sweeney Cert. ¶ 20).  Nor has it participated in the administration of industry advancement programs used for that purpose (see Affidavit of James M. Sweeney dated April 7, 2005, attached to Defendant Local 150's Motion for Rule 11 Sanctions filed May 4, 2005).

175.    When Local 150 began its campaign to organize the construction materials testers in 2001, the average wage rate of employees in the industry was approximately $10.00 per hour (Simrayh Cert. ¶ 9).  Some of the most highly skilled testers made as much as $15.00 per hour while those less skilled made as little as $8.00 per hour (id.).  Some employees in the industry

46

had healthcare, but were routinely required to make copayments (id.). Retirement benefits—almost exclusively 401(k) plans—were rare (id.).

176.    At the time of the filing of this lawsuit in 2005, construction materials testers working under Local 150 contracts earned $21.00 per hour for the lowest level of experience up to $32.00 per hour for what was considered Level G class workers (Simrayh Cert. ¶ 10); see also Tab 34, GME Consultants Inc. ("GME") Counterproposal).    Construction materials testing technicians average approximately $25.00 per hour under those agreements (id.).    In addition, employers were required to contribute on an hourly basis $4.25 towards the Midwest Operating Engineers ("MOE") Health and Welfare Fund which provides health insurance benefits to participants and their families without co-payments; $3.00 per hour for pension contribution for the MOE Pension Fund, a defined contribution plan; and $0.60 per hour to the Apprenticeship Program (id.).    In addition, employees under that agreement were entitled to various other fringe benefits including holiday pay, paid vacations, personal days, and severance pay (id.).

Date:  June 2, 2008                              Respectfully submitted,

                                                 INTERNATIONAL UNION OF OPERATING ENGINEERS,
                                                 LOCAL 150, AFL-CIO

                                                 By:   s/Charles R. Kiser
                                                       One of the Attorneys for Defendant Local 150

Attorneys for Defendant Local 150:
Dale D. Pierson
Robert E. Entin
Bryan P. Diemer
Charles R. Kiser
IUOE LOCAL 150
LEGAL DEPARTMENT
6140 Joliet Road
Countryside, IL  60525
Ph. 708/579-6663; Fx. 708/588-1647

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, hereby certifies that on June 2, 2008, he electronically filed *Local 150's Rule 56.1 Statement in Support of Its Motion for Summary Judgment* with the Clerk of Court using the CM/CM/ECF system, which sent notification to the following:

Mr. Jeffrey P. Orduno  
McGreevy Williams, P.C.  
6735 Vistagreen Way  
P.O. Box 2903  
Rockford, IL 61132  

Mr. Michael E. Avakian  
3211 Port Royal Road  
Suite 103  
Springfield, VA 22151  

Mr. Gerard Smetana  
Smetana & Avakian  
39 South LaSalle Street  
Suite 1218  
Chicago, IL 60603  

By:    s/Charles R. Kiser              
One of the Attorneys for Defendant Local 150

Dale D. Pierson  
Robert E. Entin  
Bryan P. Diemer  
Charles R. Kiser  
IUOE LOCAL 150  
LEGAL DEPARTMENT  
6140 Joliet Road  
Countryside, IL 60525  
Ph. 708/579-6663  
Fx. 708/588-1647  

I:\LI\MES, et al.v. Local 150, et al\Pleadings\MSJ\56.1 Statement\56.1.stmt.06-02-08.ddp.lms.doc